RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0196p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

GERALD L. BROWN,

                *Petitioner-Appellant,*

    *v.*

KHELLEH KONTEH, Warden,

                *Respondent-Appellee.*

Nos. 06-4037/4043

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 05-00540—John D. Holschuh, District Judge.

Argued: April 25, 2008

Decided and Filed: June 2, 2009

Before: DAUGHTREY, GILMAN, and ROGERS, Circuit Judges.

_____

**COUNSEL**

_____

**ARGUED:** Andrew P. Avellano, Columbus, Ohio, for Appellant. M. Scott Criss, OFFICE
OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:**
Andrew P. Avellano, Columbus, Ohio, for Appellant. M. Scott Criss, OFFICE OF THE
OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

**OPINION**

_____

    MARTHA CRAIG DAUGHTREY, Circuit Judge. A violent rampage through the
Beacon Hill Apartment complex in Columbus, Ohio, on August 14, 2001, resulted in the
burglary of two apartments, three aggravated robberies, two vicious beatings, and a murder.
The petitioner, Gerald L. Brown, Jr., was eventually convicted for the numerous crimes.
Although the State of Ohio sought to execute Brown for his participation in the offenses, a
three-judge panel that heard the evidence against him sentenced him instead to life in prison
without consideration for parole for 69 years. The petitioner then unsuccessfully attempted

1

to overturn his convictions both through the Ohio state court appeals process and through habeas corpus proceedings in federal district court. Brown now appeals from the district court's denial of his habeas petition, alleging only that the Ohio state courts unreasonably concluded that the evidence adduced at his trial was legally sufficient to support the various convictions. For the reasons set forth below, we affirm the district court's ruling in part, reverse in part, and remand the case for entry of such orders as are appropriate and necessary to comply with this opinion.

## I. *FACTUAL BACKGROUND*

Because Brown's habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), factual determinations made by the state courts are presumed to be correct. *See* 28 U.S.C. § 2254(e)(1). Moreover, only by clear and convincing evidence can a petitioner overcome that statutory presumption. *See id.* To demonstrate the enormity of Brown's task in this appeal, we quote at length from the recitation of the pertinent trial evidence by the Ohio Court of Appeals and thus highlight just how extensive and thorough that recapitulation was. In its opinion, the state appellate court summarized the evidence at the petitioner's trial as follows:

> According to the state's evidence, on or about August 14, 2001, LaToya Dixon, who was 16 years old at the time, paged Dennis Michael Williams, aka "Mikey," and invited him to her apartment. At that time, Dixon lived in apartment 2F at 4611 Refugee Road, Columbus, Ohio, in an apartment complex that was then called the Beacon Hill Apartments.
>
> Within about an hour, Williams, who was accompanied by male friends whom Williams later introduced to Dixon as "cousins" and with whom Dixon was unfamiliar, arrived at Dixon's apartment complex in two cars. Dixon met Williams and his companions in the parking lot of the apartment complex, and Dixon escorted Williams and his companions to her apartment. At trial, Dixon could not recall Williams'[s] companions' names.
>
> One of Williams'[s] companions asked Dixon if he could use her telephone. Dixon agreed. However, when the telephone apparently did not work, Williams'[s] companion attempted to break the telephone. Although Williams attempted to calm Dixon, Dixon became concerned and asked Williams'[s] companion why he was attempting to break her telephone.
>
> Dixon, who was now concerned about her safety, then went across the hall to the apartment of a neighbor, Emmitt Grant, and asked for a

"Black & Mild" cigar. According to Dixon, Grant was aware that Dixon did not smoke and by asking for the cigar Dixon had hoped "to let [Emmitt Grant] know that I felt like something was about to happen in my house." While Dixon was talking with Grant, some of the individuals that Dixon had allowed into her apartment observed Dixon through the peephole.

After talking with Grant, Dixon returned to her apartment. Upon returning to her apartment, Dixon and Williams went into the bathroom to talk. The men that accompanied Williams remained in Dixon's living room. At some point, Williams'[s] companions left Dixon's apartment.

Dixon and Williams then retired to Dixon's bedroom to have sex. However, Dixon ultimately decided against having sex with Williams and left the apartment. As she exited the apartment, Dixon passed Williams'[s] companions, who were entering Dixon's apartment.

After exiting her apartment, Dixon went by the apartment complex's pool and came upon Jerramie Hill and John Hill, who inquired of Dixon what was happening. Dixon told the Hill brothers that she was waiting for Williams and his companions to leave her apartment and "[t]hey were acting crazy." Dixon also told the Hill brothers that they should not intervene.

Dixon then began walking with the Hill brothers. At some point, Williams and his companions jumped out from an entryway, surrounded the Hill brothers, and attacked them.

Dixon then ran to her apartment to change her clothes, "[b]ecause I didn't have-really have no clothes on. I had like a dress on. I didn't have no shoes or nothing on * * *." She later peered through a broken window into the Hill brothers' apartment. Dixon observed a man with many compact discs in his hand. She recognized this man as one of Williams'[s] companions. The apartment was in disarray and there was blood on the walls. Dixon also observed someone being beaten in the bathroom. She also heard screams and stomping sounds from the apartment. Dixon also recognized Williams'[s] voice coming from the Hill brothers' apartment. She did not hear any gunshots, nor did she observe anyone being hit with a commercial blower that purportedly was in the Hill brothers' apartment.

Fearing for her own safety, Dixon fled to a friend's house. The next day she contacted police.

According to Emmitt Grant, who lived in apartment 2E across from Dixon's apartment, after a female friend with whom Grant had spent the evening left his apartment between 1 and 1:30 a.m. on August 14, 2001, Grant remained in his apartment and played video games. Because the weather was pleasant, he left the door to his apartment open.

According to Grant, at approximately 2 a.m. on August 14, 2001, he observed Dixon leave her apartment. Approximately five minutes later, Dixon returned to her apartment and was accompanied by some black males.

Approximately five minutes later, Grant observed two men exit Dixon's apartment and go down the stairs. After a couple of minutes, these men returned to Dixon's apartment. Grant also heard one man, upon exiting Dixon's apartment scream, "Fuck, that. Who is he? Who is he?"

At some point, Grant closed the door to his apartment. As he retreated to his seat, there was a knock at his door. Dixon was at the door and asked Grant for a cigar. She did not appear to be upset. Dixon returned to her apartment and, as she opened the door to her apartment, Grant observed several men in Dixon's apartment.

As Grant turned to return to his apartment, one of the men greeted Grant. Grant returned the greeting, entered his apartment, and closed the door. Later, however, because Grant felt that he should not have to close his door, he reopened the door to his apartment and left it halfway open.

A few minutes after Grant reopened his door, a man stood in the doorway to his apartment with his back toward Grant. The man looked over his shoulder and inquired as to what Grant was doing. Grant replied that he was playing a Dreamcast game.

As the man stood at the doorway, another man entered Grant's apartment without invitation from Grant and stood in front of a table by the couch. Next, the man who had been standing in the doorway entered Grant's apartment also without invitation and swung at Grant. A fight ensued. Two other men entered Grant's apartment and attacked Grant. During the fight, Grant saw a person run toward the back of his apartment. This same person slammed Grant's entertainment center to the floor.

During the fight, Grant observed a gun fall from the hip of the person that had first swung at him. Grant then heard others in the background scream, "Get your gun, get your gun. * * * He's about to get your gun." Grant's hand was then kicked away from the gun that had hit the floor. A cable cord from Grant's videocassette recorder ("VCR") was wrapped around Grant's neck, and later an attacker hit Grant's head with a little table. After being struck three times in the head with the table, Grant fell to the floor. The man that had wrapped the cord around Grant's neck then said, "Fuck it. Let's drag his ass to the back." In court, Grant could not identify defendant as one of the men who had been in his apartment.

At some point, Grant escaped from his attackers. Grant ran across the apartment complex to an apartment that was illuminated. An elderly resident came to the door. Grant asked the resident to call Grant's family or friends. Instead, the resident called 911.

Officers Patrick Seaman and Aaron Dennis of the Columbus Division of Police responded to the location where the 911 call was placed by the elderly resident. Earlier police had also received another call from the resident in the apartment below Grant's apartment concerning a

commotion or fight in Grant's apartment. After viewing Grant, Officers Seaman and Dennis summoned paramedics to attend to Grant's injuries.

Officers Seaman and Dennis then went to Grant's apartment to investigate and secure the crime scene. When Officers Seaman and Dennis arrived at Grant's apartment, Officer Seaman observed that the apartment was torn apart and it appeared that a fight had occurred in the apartment. In the bedroom, Officers Seaman and Dennis found what appeared to be crack cocaine on a plate on a dresser. Officers Seaman and Dennis found no suspects in Grant's apartment.

While Officer Dennis remained at Grant's apartment, Officer Seaman returned to the location where the paramedic was treating Grant. Officer Seaman, along with a paramedic, then escorted Grant back to his apartment. During the walk to Grant's apartment, Officer Seaman saw a PlayStation game on the grass in the courtyard near another apartment. Because it was unusual to see an unattended PlayStation game in the middle of the grass, Officer Seaman remained to investigate while the paramedic and Grant continued toward Grant's apartment.

Near the location where the PlayStation game was found, Officer Seaman noticed a ground floor apartment with an open window. Because it was unusual to have a wide-open window in a ground floor apartment in this particular apartment complex that had a high crime rate, Officer Seaman went to the apartment to investigate. Looking through the window, Officer Seaman observed debris in the apartment. Next, Officer Seaman noticed that the door to the apartment was wide open. Officer Seaman radioed his location. Shortly afterward, Officer Seaman noticed blood on the door and a blood trail that appeared to start from the apartment and continue through the stairwell.

After announcing his presence, Officer Seaman entered the apartment. The apartment was torn apart and there was blood on the walls. As Officer Seaman passed the bathroom, he saw blood and noticed the bathroom was torn apart. As Officer Seaman entered the bedroom, he saw one white male, Jerramie Hill, curled in a fetal position on the bed and covered in blood. Another white male, John Hill, who was also covered in blood, was lying facedown on the floor. Officer Seaman radioed his findings. Officer Dennis, who had been in Grant's apartment, then left Grant's apartment to assist Officer Seaman.

Officer Seaman observed shell casings and one spent bullet. Next to John Hill, Officer Seaman noticed a pool of blood on the floor and a bullet wound on the body with burn marks around it. According to Officer Seaman, John Hill was dead.

Officer Seaman initially believed Jerramie Hill, who appeared badly beaten, was also dead. However, after determining Jerramie Hill was alive, Officer Seaman summoned a paramedic.

According to Jerramie Hill, a witness for the state, he and his brother, John Hill, were walking in the apartment complex when they saw Dixon standing underneath some steps. Dixon appeared upset and the Hill brothers asked her what she was doing. Dixon responded that there were some individuals in her apartment. While Jerramie and his brother were walking with Dixon toward their apartment, four black males confronted Jerramie Hill and his brother. The men stopped the Hill brothers, asked the brothers to put their arms in the air, and patted them down. Then one man punched John Hill in the mouth and cut his lip. John Hill went toward some steps and spit blood out of his mouth. Then the Hill brothers went to their apartment.

At the apartment, John Hill went to the bathroom to clean his lip. As Jerramie Hill was trying to shut the screen to a window that had been broken the night before, one of the individuals that had stopped the Hill brothers came in through the broken window, opened the front door to the apartment, and let in the other two members of the group that had earlier confronted the Hill brothers.

After members of the group entered the apartment, the intruders queried Jerramie Hill about items in the apartment. Jerramie Hill attempted to represent that the items did not belong to him and he told the intruders they could take the items, such as a television and a Sega Dreamcast game system. The intruders questioned Jerramie Hill about who was in the apartment's back room. Jerramie Hill informed the intruders that his brother was in the back room.

The intruders ordered Jerramie Hill to help them carry items out of the apartment. At one point, Jerramie Hill attempted to flee the apartment.

One of the intruders grabbed Jerramie Hill, threw him to the floor and began to stomp on his head. Two other intruders went to the back of the apartment. According to Jerramie Hill, during the attack he drifted in and out of consciousness. However, Jerramie Hill recalled being hit over the head with a carpet blower that had been placed in his apartment to dry the carpet because the apartment previously had been flooded. Hill did not hear any gunshots.

Jerramie Hill regained consciousness while paramedics were attending to his injuries. According to Hill, he was hospitalized for more than a week following the attack, and that due to the attack his "balance is not the same." Further, he stated, "I've lost three of my jobs 'cause my movement wasn't fast enough." Hill could not identify any of the intruders.

According to the state, in addition to the attacks of the Hill brothers and Grant, items were also stolen from the Hill brothers' apartment and from Grant's apartment. According to Jerramie Hill, a television, compact discs, a dragon statue, and a Sega Dreamcast system were missing from his apartment. According to Grant, clothes, shoes, boots, a PlayStation 1 video

game machine, Sega Dreamcast video game machine, a video game, jewelry, and a cell phone were missing from his apartment.

At trial, portions of a videotaped interview of defendant that was conducted on November 6, 2001, by Detective Carl Rankin of the Columbus Police Department were played and transcribed into the record. Detective Rankin also testified at trial. According to Detective Rankin, following Grant's assault, he had linear bruising from ear to ear, which was consistent with Grant's account of being choked with the VCR cable cord.

According to Detective Rankin, prior to interrogating defendant, defendant voluntarily waived his constitutional rights under Miranda. During the videotaped interview, defendant provided police with his factual account of the events of August 14, 2001. At the interview, defendant admitted to involvement with the attacks of Grant and the Hill brothers. However, defendant denied killing John Hill.

According to Dr. Dorothy E. Dean, forensic pathologist and deputy coroner, based upon her evaluation, John Hill sustained blunt-force injuries and eight entrance gunshot wounds, although two of these entrance gunshot wounds may have been reentry wounds, thereby suggesting he had been shot six times in total. According to Dr. Dean, John Hill died from bullet wounds to his torso that injured his heart and arteries. Based upon the autopsy, Dr. Dean opined that John Hill had not been beaten severely prior to his death.

In contrast to the state's evidence, defendant presented a differing version of the events of August 14, 2001.

According to defendant, on the evening of August 14, 2001, LaToya Dixon paged Mikey Williams, a "cousin" of defendant, and invited Williams to Dixon's apartment. At the time Williams received Dixon's page, Williams was with defendant, James Ingram, aka "Rock," and Cortez Smith. Prior to this time, defendant was not acquainted with Cortez Smith.

Defendant, who had been drinking, James Ingram, and Cortez Smith accompanied Williams to Dixon's apartment. Defendant and Ingram rode with Williams while Smith drove another vehicle and followed the others to Dixon's apartment.

Although Dixon did not know Williams'[s] companions, she allowed Williams and his companions to enter her apartment. According to defendant, there may have been an understanding between Williams and his companions that they would have sex with Dixon.

At one point, Dixon left her apartment and later returned. After the planned sex did not materialize, defendant, Ingram, and Smith left Dixon's apartment. Williams remained in the apartment.

While defendant and the others were outside Dixon's apartment, defendant and Emmitt Grant exchanged stares and words. Defendant

informed Williams about the encounter with Grant. Defendant, Williams, and Ingram then entered Grant's apartment and fought with Grant. Williams was the first person to punch Grant. During the fight, defendant held Grant and punched him in the ribs while Ingram punched Grant in the face. During the fight, defendant did not know the whereabouts of Smith. At some point, Grant escaped and fled. Williams pursued Grant. Defendant and Ingram followed.

Defendant, Ingram, and Smith then came upon the Hill brothers. A fight ensued and continued in the Hill brothers' apartment. Defendant admits that he beat Jerramie Hill while he was in the Hill brothers' apartment and that he struck John Hill. However, defendant denies that he struck Jerramie Hill with a commercial blower or that he ever threatened the use of a handgun. Defendant also claimed he was not in the bedroom when John Hill was shot. According to defendant, he did not shoot John Hill, nor did he hear any gunshots.

After fighting with the Hill brothers, defendant, along with Williams, Ingram, and Smith, headed toward Williams'[s] car. Smith, however, decided to return to the apartments to steal a video game. Because Smith was gone awhile, defendant searched for him. While searching for Smith, defendant reentered the Hill brothers' apartment and observed that neither Jerramie Hill nor John Hill was moving. Smith was not in the Hill brothers' apartment.

Defendant then observed Smith coming downstairs from the area of Grant's apartment. Smith was carrying a video game. Defendant also observed a shiny object in Smith's hand, which Smith put in his pocket. Defendant believed the shiny object was a gun.

Defendant, Williams, Ingram, and Smith then left the apartment complex. Defendant and Ingram rode with Williams, while Smith drove away separately.

According to Tom Stanley, a fire department paramedic who attended to Emmitt Grant on August 14, 2001, the courtyard where Grant was examined was dark and Stanley could not recall observing any bruising along Grant's neck. Cf. testimony of Detective Rankin who testified Grant had bruising on his neck. Additionally, according to Stanley, Grant refused to be transported to the hospital.

Detective Edward Cox of the Columbus Police Department testified regarding the arrest of Cortez Smith related to a series of robberies that occurred in November 2001. Detective Cox also testified about the items that were recovered from Smith at the time of his arrest in November 2001. These items included two chrome .32 caliber semiautomatic pistols and a pair of red work boots. However, according to earlier cross-examination testimony of Detective Rankin in the state's case in chief, although a .32 caliber weapon was used in the killing of John Hill, the weapons recovered

from Smith in November 2001 were not the weapons used in the killing of John Hill.

Officer Aaron Dennis of the Columbus Police Department testified that he did not observe any linear bruising of Emmitt Grant's neck. According to Officer Dennis, after he and Officer Seaman investigated Grant's apartment, both he and Officer Seaman returned to Grant, who was receiving medical treatment by paramedics. He and Officer Seaman intended to escort Grant to his apartment and question him about the events that occurred in his apartment and about the suspected crack cocaine that Officers Seaman and Dennis found in his apartment.

According to Officer Dennis, he and Grant headed toward Grant's apartment while Officer Seaman stayed behind. While Officer Dennis was with Grant in Grant's apartment, Officer Dennis heard Officer Seaman's radio transmissions. After hearing Officer Seaman's second radio transmission, Officer Dennis left to assist Officer Seaman.

Approximately 20 minutes later, Officer Dennis returned to Grant's apartment. After returning to Grant's apartment, Officer Dennis noticed that the suspected crack cocaine that was in Grant's bedroom was no longer there.

Cortez Smith, who at the time of his testimony was incarcerated related to charges arising from the circumstances of this case as well as another case and who had entered into a plea agreement with the state, testified that he stole a Sega Dreamcast video system, a video game, and clothes, including red boots, from Emmitt Grant's apartment. On direct examination, Smith admitted to a history of substance abuse, which included the use of alcohol, "weed," ecstasy, and cocaine.

According to Smith, on the morning of August 13, 2001, he had used alcohol, marijuana, and ecstasy. Later that same day, Smith went to an apartment where he met Williams, Ingram, defendant, and others. According to Smith, at that apartment, alcohol was consumed and there also might have been cocaine use.

From this apartment, Smith drove in a separate car to the Beacon Hill apartment complex, while Williams, defendant, and Ingram rode to the Beacon Hill apartment complex in Williams'[s] car. According to Smith, the first time he met LaToya Dixon was on the night of August 14, 2001, in her apartment. Smith confirmed that a fight had occurred in Emmitt Grant's apartment, but Smith did not recall hearing anyone state, "Let's open him [Grant] up" or words that could be vaguely construed as this.

According to Smith, he was in Grant's apartment approximately three to five minutes. After taking the Sega Dreamcast video system and other items, Smith testified he went to the car that he was driving and put the stolen items into the backseat. Then, according to Smith, he returned to both Grant's apartment and Dixon's apartment and found no one there. Smith

then left. According to Smith, he was at the Beacon Hill apartment complex a total of approximately 15 to 20 minutes. According to Smith, when he left the apartment complex, Williams'[s] car was still in the parking lot.

On cross-examination, Smith testified that he observed defendant and the others fighting Emmitt Grant in the living room of Grant's apartment. According to Smith, he entered Grant's apartment after the fight had begun. After entering Grant's apartment, Smith went to Grant's bedroom to investigate whether there was anything of value that he could steal. Smith admitted to stealing items from Grant's closet, but he denied rummaging through Grant's dresser drawers. After stealing items from Grant's bedroom, Smith stole a Sega Dreamcast video system on his exit from Grant's apartment.

On redirect examination, Smith testified that he recalled seeing the Hill brothers; however, Smith did not recall exactly when he saw them.

According to Smith, during the fight in Grant's apartment, a gun dropped to the floor. Smith did not pick up the gun, but he did observe someone else pick up the gun. Smith described the gun that fell to the floor as "[l]ike them guns that Germans have in them old German movies, like-like dark-dark black, like a black gun. I think it was a wood handle with like funny kind of-kind of nozzle on it or barrel, whatever you call it." According to Smith, he thought he had seen the gun earlier in the evening. Smith denied handling the gun.

By an 11-count indictment filed November 15, 2001, defendant was charged with two counts of aggravated burglary, each count with two specifications; three counts of aggravated robbery, each count with two specifications; two counts of attempted murder, each count with two specifications; two counts of felonious assault, each count with two specifications; and two counts of aggravated murder, each count with five specifications.

On September 6, 2002, defendant waived his right to a jury trial and elected to be tried by the court. A panel of three judges was assigned to hear the case.

On September 17, 2002, the lead prosecutor filed an affidavit that requested the disqualification of one judge who was assigned to the three-judge panel that was scheduled to hear the case. On October 9, 2002, the Chief Justice of the Supreme Court of Ohio denied the requested disqualification of the assigned panel member.

A trial was held in late November 2002. The three-judge panel found defendant guilty of all charges in the indictment. However, with respect to count ten, aggravated murder as it related to aggravated burglary, the panel found defendant was not the principal offender in the commission of the aggravated murder and the aggravated murder was not committed with prior calculation or design. Furthermore, with respect to count eleven,

aggravated murder as it related to aggravated robbery, the panel found defendant was not the principal offender in the commission of the aggravated murder and the aggravated murder was not committed with prior calculation and design.

Finding that several mitigating factors existed according to a preponderance of the evidence, the trial court excluded the death penalty as a possible sentence. Instead, the trial court sentenced defendant to life with no consideration for parole for 69 years.

*State v. Brown*, No. 03AP-130, 2004 WL 1277498, at *2-9 (Ohio App. 10 Dist. June 10, 2004) (footnotes, citations, and internal quotation marks omitted).

After recounting that evidence, two judges of the Ohio Court of Appeals engaged in an equally thorough and meticulous exposition of how an application of relevant Ohio criminal law precepts to those facts supported Brown's felony-murder conviction, as well as his convictions for the additional charged offenses. The majority first noted that Brown failed to challenge four of his convictions: the aggravated burglary of Emmitt Grant (Count 1); the felonious assault of Emmitt Grant (Count 4); the aggravated burglary of the apartment of the Hill brothers (Count 5); and the felonious assault of Jerramie Hill (Count 9). The legitimacy of those convictions thus was not properly before the appellate court.

In addressing the petitioner's challenge to his three aggravated robbery convictions, the state-court majority first conceded that "there is no evidence that defendant himself possessed or had under his control a gun during the aggravated robberies of August 14, 2001, and therefore the evidence does not support a finding that defendant was a principal offender with respect to the charges of aggravated robbery" of Emmitt Grant, Jerramie Hill, and John Hill. *Id.* at *11. Nevertheless, the court noted that Ohio law permits an aggravated robbery conviction, even if the defendant did not personally possess a weapon, if that defendant "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 754 N.E.2d 796, 801 (Ohio 2001). Finding that Brown did so assist in the robberies, the majority affirmed those convictions.

Similarly, the majority of the Ohio Court of Appeals concluded that Brown could be held responsible for the murder of John Hill and for the charged gun specifications, in part because the petitioner knew that at least one of his companions possessed a firearm.

Furthermore, the court reasoned that Brown, "through his participation in the crimes that occurred in the Hill brothers' apartment, supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of aggravated murder, and that the [petitioner] shared the criminal intent of the principal in the purposeful killing of John Hill." *Brown*, 2004 WL 1277498, at *16.

One judge of the state appellate court dissented in part. In that partial dissent, Judge Bryant stated that, because the murder of John Hill was not necessary to carry out the purposes of the group's criminal activities, and because the evidence at trial did not necessarily place Brown in the back bedroom where Hill was murdered, the constitutional evidentiary standard for criminal convictions had not been satisfied. *See id.* at *20 (Bryant, J., concurring in part and dissenting in part).

After Brown filed his habeas corpus petition in federal court, the district judge referred the matter to a magistrate judge for an initial determination of facts and a recommended disposition. Noting the federal courts' limited discretion in most habeas review, the magistrate judge quoted extensively from the state appellate court opinion and recommended denial of the petition. The district court adopted that recommendation, entered an order finding the trial evidence constitutionally sufficient to sustain Brown's convictions, and denied the petition for habeas corpus relief in its entirety. Following denial of the petitioner's subsequent motion to alter or amend that judgment, Brown perfected this appeal.

## II. *DISCUSSION*

### A. *Standard of Review*

At the outset, it is important to recognize, as did the magistrate judge in this case, just how limited is our review in a habeas proceeding. Pursuant to the provisions of AEDPA, a federal court may not grant the writ unless the state court adjudication on the merits either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

As explained by the United States Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

In deciding whether a state court ruling involved an "unreasonable application" of federal law, a habeas court does not focus merely upon whether the state court decision was erroneous or incorrect; rather, a federal court may issue a writ of habeas corpus only if the state court's application of clearly-established federal law was objectively unreasonable. *See id.* at 409-11.

In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could *not* have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable. *See* 28 U.S.C. § 2254(d)(2).

Cognizant of these mandated glosses upon our review, we undertake an examination of the sufficiency of the evidence for each of the counts of the indictment under which Brown was convicted. Again, we emphasize, before beginning this evaluation, that we cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt. We cannot even inquire whether *any* rational trier of fact would conclude that petitioner Brown is guilty of the offenses with which he was charged. Instead, we must determine whether the Ohio Court of Appeals itself was unreasonable in *its* conclusion that a rational trier of fact could find Brown guilty beyond a reasonable doubt based upon the evidence introduced at trial. *See, e.g.*, *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) ("The question 'is not whether a federal court believes the state court's determination . . . was incorrect but whether that determination was unreasonable – a substantially higher threshold.'") (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## B. *Crimes Committed Against Emmitt Grant*

### Aggravated Burglary (Count 1)

Brown has not challenged, either in this appeal or before the Ohio Court of Appeals, his conviction for the aggravated burglary of Emmitt Grant's apartment. Consequently, we deem any objection to the legal sufficiency of the evidence offered to prove the petitioner's guilt of that offense to have been waived. *See, e.g.*, *Bickel v. Korean Air Lines Co.*, 96 F.3d 151, 153 (6th Cir. 1996).

### Aggravated Robbery (Count 2)

Under Ohio law, "[n]o person . . . committing a theft offense . . . shall . . . [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[,] [or] [i]nflict, or attempt to inflict, serious physical harm on another." *See* O.R.C. §§ 2911.01(A)(1) and (3). Should an individual commit such a theft offense while using, displaying, or brandishing a weapon, or while inflicting serious physical harm on another, that person will be guilty of aggravated robbery.

A wrongdoer need not *personally* steal items from another; *personally* use, display, or brandish a weapon; or *personally* inflict serious physical harm on a victim in order to justify conviction pursuant to the provisions of section 2911.01(A) of the Ohio Revised Code. Rather, an individual like Brown may be found guilty of aggravated robbery simply by aiding or abetting another person in the commission of the offense. To be liable as an aider or abettor, however, "mere association with a principal offender is not enough . . . . [T]here must be some level of active participation by way of providing assistance or encouragement." *State v. Nievas*, 700 N.E.2d 339, 343 (Ohio Ct. App. 1997) (citation omitted). In the words of the Ohio Supreme Court, "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *Johnson*, 754 N.E.2d at 801. Indeed, the intent necessary to support a conviction "may be inferred from presence, companionship and conduct before and after the offense is committed." *State v. Mootispaw*, 674 N.E.2d 1222, 1224 (Ohio Ct. App. 1996).

In this case, Brown insists that he was merely present in Grant's apartment – albeit beating the victim mercilessly – while co-defendant Cortez Smith was vandalizing the property. Furthermore, because the petitioner had met Smith only that evening, he claims that he cannot be held accountable for the aggravated robbery because he was not then in a position to know of Smith's criminal intentions when Smith entered Grant's apartment *after* the petitioner began his assault on the victim.

As explained above, however, the Ohio state law offense of aggravated robbery is complete upon the commission of any "theft offense" accompanied by the infliction of "serious physical harm on another." O.R.C. § 2911.01(A)(3). Brown clearly committed a "theft offense" and clearly inflicted "serious physical harm on" Emmitt Grant. Pursuant to the provisions of section 2913.01 of the Ohio Revised Code, a "theft offense" includes, among other things, "[a] violation of section . . . 2911.11 . . . of the Revised Code." O.R.C. § 2913.01(K)(1). Section 2911.11 criminalizes aggravated burglary, an offense to which Brown has admitted by failing to contest it in state and federal court proceedings. In any event, even had the aggravated burglary conviction been challenged, the statutory definition of "theft offense" also includes simple burglary, O.R.C. § 2911.12, which entails merely

trespassing in an occupied structure with an intent to commit "any criminal offense." Brown's entry into Grant's apartment to assault the victim thus satisfies one prong of the aggravated robbery evidentiary requirement. The brutal beating of Grant that included hitting him in the head with furniture and tightening a cable around his neck so securely that ligature marks were later seen by witnesses further satisfies the "serious physical harm" component of the offense and justifies the state court decision to find sufficient evidence of petitioner Brown's guilt of aggravated robbery. Because the Ohio Court of Appeals's ruling on the claim of insufficient evidence relating to the charge of aggravated robbery of Emmitt Grant thus was not unreasonable, the district court did not err in denying habeas relief on this issue.

### Attempted Murder (Count 3)[1]

The petitioner was also convicted at trial of the attempted murder of Emmitt Grant. Grant testified that he was severely beaten in his own apartment, that he was struck multiple times in the head with a small table, and that a cable cord was wrapped around his neck tightly enough that ligature marks could be seen. Brown insists on appeal, however, that he could not be held responsible for that crime because no trial witness identified him as one of Grant's assailants.

Pursuant to the provisions of section 2903.02(B) of the Ohio Revised Code, "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not [voluntary manslaughter] or [involuntary manslaughter]." Nor shall a person attempt to murder another individual by "purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, [engaging] in conduct that, if successful, would constitute or result in [murder]." O.R.C. § 2923.02(A).

---

[1]No discussion of any habeas corpus claim related to the charge in Count 4 of the indictment alleging felonious assault of Grant is required, because that charge merged into the attempted murder conviction under Count 3.

Brown is correct that the testimony of no other witness definitively identifies him as one of the assailants in Grant's apartment at the time of the beating and partial strangulation of the victim. The petitioner's own statement to the police, however, indicates that he was indeed an active participant in the brutal beating of Emmitt Grant. In Brown's own words, "I'm standing up against the wall like this with the guy like this; and I'm punching him in the ribs, you know what I'm saying. [A companion] hit him in the head, and I'm punching him in the ribs." Although Brown disclaimed knowledge of any cord being placed around Grant's neck, other evidence of the petitioner's involvement in the attack was placed before the finders-of-fact; as a result, the Ohio Court of Appeals clearly was not unreasonable in concluding that Brown at least aided and abetted those individuals who assaulted Grant so viciously that the attack could have resulted in the victim's death. The district court's denial of habeas relief on this ground thus must be affirmed under prevailing AEDPA standards.

## C. *Crimes Committed Against Jerramie and John Hill*

**Aggravated Burglary (Count 5)**

Brown has not challenged, either in this appeal or before the Ohio Court of Appeals, his conviction for the aggravated burglary of the Hill brothers' apartment. Consequently, we deem any objection to the legal sufficiency of the evidence offered to prove the petitioner's guilt of that offense to have been waived. *See, e.g.*, *Bickel*, 96 F.3d at 153.

**Aggravated Robbery (Counts 6 and 7)**

As stated previously, Ohio law defines aggravated robbery, in part, as a theft offense accompanied by the infliction, or attempted infliction, of serious physical harm on another. *See* O.R.C. § 2911.01(A)(3). Although Jerramie Hill could not positively identify any of the individuals who broke into his apartment in the early morning hours of August 14, 2001, in Brown's own statement to the police he admitted that he and at least one of his companions that night had indeed broken into the Hills' apartment and assaulted the brothers. Furthermore, LaToya Dixon, from the vantage point of her own

apartment, was able to see one of Brown's companions leaving the apartment that night with a stack of compact discs. Jerramie Hill also testified that not only were numerous compact discs taken from his apartment, but he was also missing a video game and video game player, a television, and a statue of a dragon.

In any event, the petitioner has conceded, through his failure to challenge the propriety of his aggravated burglary convictions in either state or federal court, that he is guilty of committing a "theft offense" against the Hills. *See* O.R.C. § 2913.01(K)(1) (defining "theft offense" as, among other crimes, a violation of the statute criminalizing aggravated burglary). That concession, in conjunction with Brown's own statement to the police admitting that he "inflict[ed] . . . serious physical harm on another" established all the necessary elements of the offense of aggravated robbery. Indeed, the petitioner told police that he began assaulting Jerramie Hill in Hill's own apartment, with the beating occurring both in the front room of the dwelling and in the back bedroom. According to Brown:

> I'm hitting him – hitting him, hitting him – just I'm hitting him. He hit – you know what I'm saying. I'm hitting.
>
> . . . . .
>
> He – I think he was probably was unconscious or something, 'cause I hit him a pretty good amount of times with my hand 'cause like I said, my whole – I mean, I was at work, and I had to go home because my whole hand was swollen.

Furthermore, while Brown was beating Jerramie Hill, James "Rock" Ingram was also in the apartment "fighting the other guy" -- John Hill.

On direct appeal, the Ohio Court of Appeals construed the evidence at trial in the light most favorable to the prosecution and concluded that "by assaulting Jerramie Hill in the Hill brothers' apartment while one of defendant's companions burglarized the Hill brothers' apartment, . . . [the] defendant was connected to or involved with the aggravated robber[y] of . . . the Hill brothers." The state court thus found that a reasonable trier of fact could "conclude defendant supported, assisted, or cooperated in the aggravated robber[y] of . . . the Hill brothers." Such a conclusion is not unreasonable

in light of the evidence contained in the appellate record. Consequently, we are not authorized to reverse the district court's denial of habeas relief on this ground.

**Attempted Murder of Jerramie Hill (Count 8)[2]**

The petitioner argues ineffectively that he should not have been convicted of the attempted murder of Jerramie Hill because Hill could not identify Brown as his assailant and because no other witness testified that Brown was indeed the person who brutally beat Jerramie Hill. Those argumentative statements are true – as far as they go. What the petitioner fails to mention, however, is the fact that *Brown's own statement* to the police contains his admission and detailed description of his entry into the Hills' apartment and of his savage attack upon Jerramie Hill. In fact, that beating was so violent that Hill lost consciousness and Brown later was forced to leave work and return home because his hand was swollen from repeatedly striking the victim.

The Ohio Court of Appeals, "construing the evidence in favor of the prosecution, [found] a trier of fact reasonably could conclude that defendant engaged in conduct that, if successful, would result in purposely causing the death[ ] of . . . Jerramie Hill." Such a conclusion that the prosecution established the elements of the offense of attempted murder, *see* O.R.C. §§ 2903.02 and 2923.02(A), is nothing if not reasonable. We thus affirm the district court's conclusion denying habeas relief on the petitioner's claim related to his conviction for the attempted murder of Jerramie Hill.

---

[2]Just as the indictment count alleging felonious assault upon Emmitt Grant merged with the petitioner's conviction for the attempted murder of Grant, Count 9 of the indictment alleging a felonious assault upon Jerramie Hill merged with the conviction of Brown for the attempted murder of Hill.

## Aggravated Murder of John Hill (Counts 10 and 11)[3]

On appeal, Brown also challenges the constitutionality of his conviction for aiding and abetting the aggravated murder of John Hill during the commission of an aggravated robbery. He contends that the prosecution could not establish his guilt of that offense beyond a reasonable doubt because "[t]he record is bereft of any evidence that Gerald Brown intended to purposefully cause the death of John Hill," because there was no testimony or evidence that Brown planned to commit an aggravated robbery, and because no evidence linked the petitioner to the actual killer. *See* Appellant's Br. at 21.

In addressing the challenge to the sufficiency of the evidence for this conviction on direct appeal, the Ohio Court of Appeals explained:

> Pursuant to [the version of Ohio Revised Code Section 2903.01 in effect at the time of the commission of the crimes at issue]:
>
>> (A) No person shall purposely, and with prior calculation and design, cause the death of another * * *.
>>
>> (B) No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, or escape.
>>
>> * * *
>>
>> (F) Whoever violates this section is guilty of aggravated murder, and shall be punished as provided in section 2929.02 of the Revised Code.
>
> Here, we find there is no evidence that defendant purposely, and with prior calculation and design, caused the death of John Hill (see former R.C. 2903.01[A]), nor is there evidence that defendant purposely caused the death of John Hill while committing or attempting to commit one of the enumerated crimes under former R.C. 2903.01(B).

---

[3]The conviction of the petitioner for Count 10 (aggravated murder of John Hill during the aggravated burglary of the Hills' apartment) merged with the conviction of the petitioner for Count 11 (aggravated murder of John Hill during the aggravated robbery of Hill).

Therefore, construing the evidence in favor of the prosecution, we must determine whether there is sufficient evidence that defendant aided and abetted the principal in the aggravated murder of John Hill. For defendant to have aided and abetted the principal in the aggravated murder of John Hill, the evidence must show that defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of aggravated murder and that defendant shared the criminal intent of the principal to commit aggravated murder.

* * *

In this case, defendant participated in the assault of Emmitt Grant during which a gun fell from the pants of one of Emmitt Grant's assailants and landed upon the floor of Grant's apartment. During the fight, Grant heard others in the background scream, "Get your gun, get your gun. * * * He's about to get your gun." Grant's hand was then kicked away from the gun that had hit the floor. Furthermore, Cortez Smith testified that he saw an unidentified person pick up a gun after it dropped to the floor.

Based upon this evidence, we find a trier of fact reasonably could infer that defendant was aware that someone in the group may have had a gun when defendant and his companions later committed crimes in the Hill brothers' apartment, which resulted in the shooting and death of John Hill. Furthermore, under these circumstances, we find a trier of fact reasonably could infer defendant acquiesced in the use of a gun.

Moreover, construing the evidence in favor of the prosecution, because the endangerment of John Hill's life began in the apartment courtyard wherein John Hill and his brother were accosted, and then in apparently short order the endangerment progressed to the Hill brothers' apartment where John Hill was murdered, we find that a trier of fact reasonably could find that the attack on the Hill brothers in their apartment, which resulted in the murder of John Hill, was a natural and probable consequence of the attack that had initially begun in the courtyard.

Additionally, we find that, beyond a reasonable doubt, a trier of fact reasonably could conclude that defendant engaged in a common design with others to rob the Hill brothers by the use of force and violence, and that John Hill's murder was a natural and probable consequence given the force and violence used in the robbery, which created circumstances that in all probability would endanger human life.

Accordingly, . . . we find sufficient evidence showing that defendant, through his participation in the crimes that occurred in the Hill brothers' apartment, supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of aggravated murder, and that

defendant shared the criminal intent of the principal in the purposeful
killing of John Hill.

*State v. Brown*, 2004 WL 1277498, at *13, 16 (citations and internal quotation marks
omitted).

Brown's objections to the district court's denial of habeas relief on this ground
are meritless. Although it is true that no evidence adduced at trial established that the
petitioner personally *intended*, with prior calculation and design or even during the
commission of another felony, to kill John Hill, demonstration of such an intent is not
the only manner in which criminal liability for the murder may be imposed upon Brown.
Indeed, evidence was before the triers of fact that Brown and his cohorts engaged in an
unprovoked attack upon both John and Jerramie Hill, an attack that escalated into a full-
blown, strong-arm robbery. Given Brown's active participation in the physical beatings
and home invasion, there is no question that had John Hill died as a result of a physical
beating that was coordinated with Brown's beating of Jerramie Hill in furtherance of a
robbery, the petitioner would be liable for aiding and abetting that death. The fact that
the beating of John Hill escalated into a shooting death in no way exonerates the
petitioner from complicity in the criminal deed, especially given the record evidence that
Brown had to have been aware, at least since the beating of Emmitt Grant, that one of
his companions – other than Cortez Smith – was in possession of a handgun.

The petitioner, and the dissenting judge on the Ohio Court of Appeals panel,
insist that the Ohio case of *State v. Trocodaro*, 301 N.E.2d 898 (Ohio Ct. App. 1973),
requires that Brown's aggravated murder conviction be overturned. In *Trocodaro*, the
state court held that "unless one is in pursuance of a conspiracy previously formed, his
involvement in an altercation which although connected with, is not the specific
altercation occasioning, a homicide should not be held as a principal under the theory
of aiding and abetting where he has neither *actually incited, nor encouraged the
perpetrator of the homicide*." *Id.* at 902-03 (emphasis added).

Obviously, Brown believes that the appellate record contains no evidence that
he did, in fact, incite or encourage at least one of his companions to engage in actions

likely to lead to John Hill's death.  The majority of the Ohio Court of Appeals panel that reviewed the petitioner's convictions believed, however, that Brown was indeed guilty of such encouragement.

The petitioner did indicate in his statement to the police that he "was pretty heated too from that first previous fight (with Grant)," that his adrenaline was "still pumping," and that he was "ready to go."  He also admitted that he was hitting Jerramie Hill, "hitting him, hitting him -- just I'm hitting him," and that his attack was so vicious that Hill lost consciousness and that Brown's hand became swollen.  In light of such evidence, it is clearly possible that the fact-finders believed that Brown's agitated state incited other individuals with him to escalate the fury with which they also attacked the Hill brothers.  Whether such is in fact the case is, again, beside the point in this habeas appeal.  As long as we can conclude that the Ohio Court of Appeals was not unreasonable in determining that Brown was guilty of aggravated murder beyond a reasonable doubt, we must affirm the district court's decision denying habeas corpus relief.

Additionally, in an apparent effort to intimate that John Hill must have been murdered at some later time by some other individual, Brown also has emphasized throughout this prosecution that no gunshots were heard during the assaults on the Hills.  Of course, such "negative evidence" is of little import in this case, because even though no one testified to hearing gunshots later that night, it is undeniable that John Hill was murdered by gunfire.  Regardless of the presence or absence of such evidence, moreover, Brown's challenge to the district court's denial of habeas corpus relief on this claim must fail.  As we held just last year in another Ohio habeas corpus appeal challenging the sufficiency of the convicting evidence:

> Even if we were to conclude, after reviewing the record and drawing all inferences in favor of the prosecution, that [the petitioner's] convictions were not supported by sufficient evidence, the question would remain whether the Ohio Court of Appeals was unreasonable in concluding otherwise. "State court findings of fact are to be presumed correct unless the petitioner rebuts the presumption with clear and convincing evidence." *Sandgathe v. Maass*, 314 F.3d 371, 376 (9th Cir. 2002).  A

federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the state-court decision applied a Supreme Court case incorrectly." *Price v. Vincent*, 538 U.S. 634, 641 (2003) (internal brackets omitted). It must further conclude that the state-court decision was objectively unreasonable. *Williams v. Taylor*, 529 U.S. 362, 409 (2000).

*Saxton v. Sheets*, 547 F.3d 597, 607 (6th Cir. 2008).

Regardless of how we, as individual jurists, would have viewed the evidence of Brown's guilt had we been called to evaluate the strength of the prosecution's case, we cannot escape the fact that the Ohio Court of Appeals was not unreasonable in choosing to put upon this case the gloss it did. As a result, we are compelled to conclude that the district court did not err in also denying habeas corpus relief to the petitioner on his challenge to the sufficiency of the evidence adduced to convict him of the aggravated murder (felony-murder) of John Hill.

### D. *Gun Specification Convictions*

Brown also challenges the sufficiency of the evidence supporting his convictions for the various gun specifications charged in the indictment returned against him. The main thrust of this argument again appears to be a suggestion that we should view the evidence offered on the charges differently than did the Ohio Court of Appeals. We emphasize once more, however, that on habeas review, our task is not to reweigh or re-evaluate individual pieces of evidence but, rather, to determine only whether the state-court rulings on the merits of the issue were unreasonable.

Each of the 11 counts of the indictment against Brown contained specifications alleged in accordance with the provisions of sections 2941.141 and 2941.145 of the Ohio Revised Code. Pursuant to section 2941.141, a one-year prison term may be imposed upon a defendant if "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense." Section 2941.145 authorizes a three-year prison term for a defendant who "had a firearm on or about the offender's person or under the offender's control while committing the offense *and* displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or

used it to facilitate the offense." (Emphasis added.) Furthermore, the Ohio Supreme Court has recognized that the statutory firearm specifications may be applied to defendants even if those defendants were not themselves in actual control of the weapons. *See, e.g.*, *State v. Powell*, 571 N.E.2d 125, 127 (Ohio 1991) (defendant "may be charged under [the statute] on the basis of the possession of a firearm by any accomplice involved" in the charged offense).

In addressing the propriety of the gun specifications found in this prosecution, we are again cognizant of our jurisprudential rule holding that issues not adequately developed or argued in the appellate briefs are deemed abandoned and thus not addressed by this court. *See, e.g.*, *United States v. Hough*, 276 F.3d 884, 891 (6th Cir. 2002). Consequently, because Brown alludes to the gun specifications imposed upon convictions for offenses alleged in Counts 1, 4, 5, and 9 of the indictment in only the most perfunctory of manners, if at all, we choose not to disturb those judgments. Additionally, the charge of aggravated murder committed during an aggravated burglary (Count 10) merged, by operation of law, with the charge of aggravated murder committed during an aggravated robbery, as alleged in Count 11 of the indictment, and thus can result in no further punishment for the petitioner.

The Ohio Court of Appeals and the district court concluded that sufficient evidence existed in the record to support convictions for each gun specification on every count of the indictment against Brown. We disagree, however, with that blanket assertion and find some of those conclusions by the state court unsupported by any evidence and, therefore, unreasonable.

**Aggravated Robbery of Emmitt Grant (Count 2)**

As the rampage at the Beacon Hill Apartments began to unfold during the early morning hours of August 14, 2001, the petitioner and his cohorts engaged in a vicious assault upon Emmitt Grant in Grant's apartment. During that beating, a handgun fell out of the clothing of one of the attackers and landed on the floor, before being kicked away out of Grant's reach and being retrieved and re-hidden by one of the attackers. Consequently, evidence in the record establishes that the petitioner was aware, at least

at the time the gun fell to the floor, that one of his cohorts possessed a firearm.  Because, as discussed in Section II.B. of this opinion, the Ohio Court of Appeals was not unreasonable in concluding that Brown was guilty of the aggravated robbery of Emmitt Grant by inflicting serious physical harm upon him during a theft offense, the state court was also not unreasonable in concluding that the petitioner could be held accountable for the possession of a firearm by one of his accomplices during that crime.  *See* O.R.C. § 2941.141.

Moreover, the state court was not unreasonable in upholding the application of the section 2941.145 firearm specification to the conviction for the aggravated robbery of Grant.  A legitimate argument could be advanced that the momentary, accidental viewing of the firearm in Grant's apartment when the gun fell to the floor does not constitute either "display" or "brandishing."  It is equally plausible, however, that the victim's viewing of the weapon facilitated the offense by emphasizing to Grant the futility of resistance.  Given our restrictive standard for reviewing the state court decision, we conclude that the district court did not err in denying habeas corpus relief on these grounds.

**Attempted Murder of Emmitt Grant (Count 3)**

The petitioner was aware of and was a willing participant in the brutal beating of Emmitt Grant that resulted in one of Brown's attempted murder convictions.  The attack on the victim continued after a handgun fell onto the floor, was kicked away from Grant, and was retrieved by another of Brown's companions. Clearly then, the petitioner was aware of the possession of a firearm by one of his accomplices and was properly held accountable for the section 2941.141 specification.  Furthermore, although a legitimate argument could be proffered that a gun is neither "displayed" nor "brandished" when it merely falls accidentally to the floor and is immediately retrieved and rehidden, it is also far from unreasonable to believe that such a momentary exhibition of the weapon facilitated the offense by indicating to the victim the dangers inherent in resistance.  Thus, the district court did not err in determining that the Ohio

Court of Appeals was not unreasonable in applying both the section 2941.141 and the section 2941.145 firearm specifications to the petitioner for the Count 3 conviction.

**Aggravated Robberies of Jerramie and John Hill; Attempted Murder of Jerramie Hill  (Counts 6, 7, and 8)**

Following the beating of Emmitt Grant, Brown and his companions broke into the Hills' apartment and assaulted and robbed the brothers.  By that time, the petitioner was aware that someone in his group was in possession of the firearm that had fallen onto the floor in Grant's apartment.  The state court's findings that the specifications of section 2941.141 (possession of a firearm) were applicable to the crimes of aggravated robbery of the brothers and the attempted murder of Jerramie Hill thus were not unreasonable.

Furthermore, because the state court was not unreasonable in surmising that the aggravated robbery and murder of John Hill occurred in relative temporal proximity, the application of the section 2941.145 specification for use of a firearm in the aggravated robbery of John Hill was proper.  On the other hand, affirmance of the section 2941.145 specification for either displaying, brandishing, indicating possession of, or using the firearm to facilitate the offenses of aggravated robbery and attempted murder of *Jerramie* Hill would require us to engage in mere speculation.  No evidence in the record indicates that a gun was actually used or even displayed in the perpetration of those two specific crimes.  Consequently, the Ohio Court of Appeals decision to the contrary was necessarily unreasonable and the petitioner is entitled to relief on those bases.

**Aggravated Murder of John Hill During an Aggravated Robbery (Count 11)**

The Ohio Court of Appeals also affirmed the application of both the section 2941.141 and section 2941.145 firearm specifications to Brown's conviction for the aggravated murder of John Hill.  Having concluded that the petitioner can be held accountable for John Hill's death, we do not find the state court's firearm determination to be unreasonable.  Medical evidence offered at the petitioner's trial explained that John Hill died from multiple gunshot wounds.  Logically, then, the principal in the actual murder of the victim not only possessed a firearm, but clearly brandished it in the

commission of the offense.  We thus affirm the district court's denial of habeas corpus relief on this ground.

### E. *Motion to Alter or Amend the Judgment*

In a final appellate issue, Brown raises the somewhat scurrilous allegation that the district judge in this habeas matter adopted the report and recommendation of the magistrate judge without adequate review and consideration of the record.  The petitioner bases his argument in this regard solely upon the fact that "only eight working days" passed between the filing of objections to the report and recommendation and the filing of the district court order adopting the magistrate judge's submission.  According to Brown, because the transcript of the petitioner's trial was 661 pages long, the district judge could not have performed a detailed review of that transcript in such a compressed time period.  Brown's appellate brief concedes, however, that 13 total days actually elapsed between the filing of his objections to the report and recommendation and the district court's order.  Despite what Brown may think, federal judges do work on weekends and holidays, at night, and during lunch periods.  Over the span of 13 days, and even over a mere eight days, a conscientious jurist could review 661 pages of transcript, digest objections offered by a lawyer to an adverse ruling, and issue a brief order adopting the magistrate judge's recommendation. The petitioner's challenge to the denial of his motion to alter or amend the judgment is thus patently without merit.

### III.  *CONCLUSION*

For the reasons discussed above, we AFFIRM in part and REVERSE in part the denial of petitioner Brown's habeas corpus petition.  Specifically:  as to Count 1 of the indictment (aggravated burglary of Emmitt Grant), because Brown did not challenge the decision rendered regarding this conviction, we AFFIRM the denial of habeas relief on the conviction itself and on both firearm specifications; as to Count 2 of the indictment (aggravated robbery of Emmitt Grant), we AFFIRM the denial of habeas relief on the conviction and on both firearm specifications; as to Count 3 of the indictment (attempted murder of Emmitt Grant), we AFFIRM the denial of habeas relief on the conviction and

on both firearm specifications; as to Count 4 of the indictment (felonious assault of Emmitt Grant), because Brown did not challenge the decision rendered regarding this conviction, we AFFIRM the denial of habeas relief on the conviction itself as well as on both firearm specifications; as to Count 5 of the indictment (aggravated burglary of the Hill brothers), again because the petitioner failed to challenge properly the district court decision regarding this conviction, we AFFIRM the denial of habeas relief on the conviction and on both firearm specifications; as to Count 6 of the indictment (aggravated robbery of Jerramie Hill), we AFFIRM the denial of habeas relief on the aggravated robbery conviction and on the section 2941.141 specification, but REVERSE the denial of habeas relief on the section 2941.145 specification; as to Count 7 of the indictment (aggravated robbery of John Hill), we AFFIRM the denial of habeas relief on the conviction and on both firearm specifications; as to Count 8 of the indictment (attempted murder of Jerramie Hill), we AFFIRM the denial of habeas relief on the actual conviction and on the section 2941.141 specification, but REVERSE the denial of habeas relief on the section 2941.145 specification; as to Count 9 of the indictment (felonious assault on Jerramie Hill), because Brown failed to challenge properly the district court determination, we AFFIRM the denial of habeas relief on the substantive conviction and on both firearm specifications; as to Count 10 of the indictment (aggravated murder of John Hill during an aggravated burglary), we acknowledge that any conviction under this count necessarily merged with the conviction for the aggravated murder of John Hill alleged in Count 11; and, as to Count 11 of the indictment (aggravated murder of John Hill during an aggravated robbery), we AFFIRM the denial of habeas relief on the conviction itself and on both firearm specifications.

We also AFFIRM the district court's denial of the petitioner's motion to alter or amend the judgment and REMAND this matter to the district court for entry of an order consistent with this opinion.