RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0183p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

KEITH BERNARD SMITH,

*Petitioner-Appellant*,

*v.*

NOAH NAGY, Warden,

*Respondent-Appellee*.

No. 18-1751

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:11-cv-10261—Arthur J. Tarnow, District Judge.

Argued: April 29, 2020

Decided and Filed: June 15, 2020

Before: COLE, Chief Judge; SILER and CLAY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Wesley R. Abrams, VORYS, SATER, SEYMOUR AND PEASE LLP, Cincinnati, Ohio, for Appellant. Daniel Ping, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Wesley R. Abrams, Nathan L. Colvin, VORYS, SATER, SEYMOUR AND PEASE LLP, Cincinnati, Ohio, for Appellant. Daniel Ping, John S. Pallas, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

_____

## OPINION

_____

COLE, Chief Judge. Keith Bernard Smith, a Michigan prisoner, appeals the denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. He argues that he is entitled to relief

because: (1) the state court should have granted him a post-trial evidentiary hearing to determine whether the jury improperly relied on certain prejudicial information in rendering its verdict; (2) there was insufficient evidence to convict him; and (3) the state and district courts erred in refusing to consider new evidence that supports his innocence. Because none of Smith's claims provides us a basis for exercising our limited authority to grant habeas relief to a state prisoner, we affirm the denial of the petition.

**I.**

On the morning of February 15, 2008, Detroit police discovered Annette Ralston, a 58-year-old woman, dead in the bedroom of her home. Ralston had suffered several stab wounds to the head and groin area, slash wounds to the face, and blunt-force wounds to the back of the head. A severed carotid artery was likely the immediate cause of death. Ralston also exhibited multiple "defensive-type" cuts and bruises on her hands and wrists, and she was clutching long brown hair, which was never matched to any particular person. Blood was found throughout Ralston's house.

Four days after the discovery of Ralston's body, police arrested Keith Smith and charged him with three crimes in connection with Ralston's death: first-degree felony murder, first-degree premeditated murder, and assault with intent to commit armed robbery. At the time that the police arrested Smith, they also seized Smith's van and other personal belongings, including a pair of eyeglasses. The van and eyeglasses were processed for blood evidence, but none was recovered. No knives or other weapons were recovered from Smith. Overall, there was no physical evidence linking Smith to Ralston's death.

At Smith's trial, two of Smith's acquaintances—Shayne Dennis and Latoya Evans—testified that Smith had come over to their house two days after the discovery of Ralston's body. At some point during the conversation, Smith admitted that he had "done something very bad" and proceeded to confess to killing a woman "at a safe house." (R. 12-4, PageID 428–29.) Smith conveyed that he had intended to rob the safe house. To that end, he dropped off the victim's son somewhere else and went back to the house with the victim, where he ended up

killing her while trying to force her to open a safe located in the bedroom. Evans recalled that Smith had identified the victim as "a fifty year old white lady." (*Id.*, PageID 514.)

Lawanda Baytops, Ralston's housemate, also testified at Smith's trial. Baytops told the jury about a "big" jewelry box that Ralston kept in her bedroom, which was "shaped like a safe" but did not have a lock. (R. 12-3, PageID 325, 350.) Baytops remembered seeing the jewelry box still in Ralston's bedroom on the morning Ralston's body was discovered. Baytops also recalled that Smith was at the house with Ralston and Ralston's son on the evening before Ralston's body was discovered. Ralston's son, James White, confirmed that Smith was at the house that evening and that, later, Smith drove White to his foster home.

The jury convicted Smith of first-degree felony murder and assault with intent to commit armed robbery but acquitted him of first-degree premeditated murder. Before sentencing, however, one juror approached defense counsel and reported that he and other jurors had changed their vote from "not guilty" to "guilty" based on a belief that Smith would receive a relatively light sentence for felony murder. Smith moved for a new trial or an evidentiary hearing, but the state trial judge declined to grant either. The trial judge then sentenced Smith to the mandatory sentence of life imprisonment without possibility of parole for the felony-murder conviction, *see* Mich. Comp. Laws § 750.316(1), and a concurrent sentence of five to forty years' imprisonment for the assault conviction. Smith appealed to the Michigan Court of Appeals, challenging both the sufficiency of the evidence used to convict him and the trial judge's denial of an evidentiary hearing and new trial. The Michigan Court of Appeals rejected Smith's arguments on the merits and affirmed his convictions. *People v. Smith*, 2009 WL 3837414, at *2, *4–5 (Mich. Ct. App. Nov. 17, 2009) (per curiam). The Michigan Supreme Court denied Smith's pro se application for discretionary review on March 29, 2010, in a summary order. *People v. Smith*, 779 N.W.2d 813 (Mich. 2010) (mem.).

On January 13, 2011, Smith, acting pro se, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Michigan. Subsequently, in March 2012, Smith moved, and the district court agreed, to hold the petition in abeyance while Smith returned to state court to exhaust additional claims.

Smith filed a motion for relief from judgment in the state trial court on June 18, 2012, which was denied in November 2012. Smith did not appeal. In March 2013, Smith filed a second motion for relief from judgment in the state trial court. Relevant here, this motion included a claim for a new trial based on an affidavit that was signed in October 2012. The affiant, Latoya Evans's brother Robert Evans, attested that he spoke with Latoya Evans and Shayne Dennis on the day that Smith allegedly confessed. Robert Evans stated that, according to his sister and Dennis, Smith had not confessed to any crime but rather only said that the police wanted to speak with him. Latoya Evans and Shayne Dennis, however, had thought that they might receive a reward for providing information and resolved to "figure out how to get that money if they could." (R. 41-3, PageID 1046.) The state court declined to consider the merits of Smith's claim for a new trial based on the affidavit, holding that the claim was procedurally barred on state-law grounds because Smith failed to establish that the affidavit's allegations were discovered after he filed his first motion for relief from judgment.

Rather than appealing the state trial court's decision, Smith filed a motion for a judgment nunc pro tunc vacating the order denying his first motion for relief from judgment, asserting that the first motion was filed by a prison paralegal without his knowledge and that he never received the court orders denying either of his motions for relief from judgment. The state trial court denied the motion. Smith filed a delayed appeal, which the Michigan Court of Appeals denied "for lack of merit in the grounds presented." *People v. Smith*, No. 331894 (Mich. Ct. App. June 27, 2016) (order). On October 24, 2017, the Michigan Supreme Court denied review in a summary order. *People v. Smith*, 902 N.W.2d 419 (Mich. 2017) (mem.).

Having exhausted his state remedies, Smith returned to the district court and amended his habeas petition in December 2017 to add new claims, including one based on the affidavit of Robert Evans. On June 12, 2018, the district court denied the amended petition. Like the Michigan Court of Appeals, the district court rejected Smith's challenges to the denial of an evidentiary hearing and to the sufficiency of the evidence. The district court construed Smith's claim based on Robert Evans's affidavit to be an actual innocence claim and rejected it as well, holding that the affidavit by itself was not sufficient to support a freestanding actual innocence

claim.   Although the district court denied the amended petition, it granted a certificate of appealability on all claims.  This timely appeal followed.

In this court, Smith filed a pro se brief and moved for appointment of counsel.  The warden responded.  We granted Smith's motion for appointment of counsel, and a second round of briefing followed.

## II.

In habeas proceedings, we review de novo the district court's legal conclusions and mixed determinations of law and fact.  *Bennett v. Brewer*, 940 F.3d 279, 286 (6th Cir. 2019).  We typically review the district court's factual findings for clear error, but when the district court bases its factual determinations only on trial transcripts and court records—making no credibility determination or other apparent finding of fact on its own—we review the district court's factual conclusions de novo.  *Id.*; *see also Ramonez v. Berghuis*, 490 F.3d 482, 486 (6th Cir. 2007); *Dando v. Yukins*, 461 F.3d 791, 796 (6th Cir. 2006).

That said, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") constrains our review of state-court decisions in habeas cases.  Under AEDPA, a claim that was "adjudicated on the merits" in the state court may not be a basis for habeas relief unless its adjudication:

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1) have "independent meaning." *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); *accord Bell v. Cone*, 535 U.S. 685, 694 (2002).  A state-court decision is "contrary to" clearly established federal law if it (1) applies a rule that contradicts governing Supreme Court law; or (2) confronts a set of facts "materially indistinguishable" from a decision of the Supreme Court and yet arrives at a

different result. *Williams*, 529 U.S. at 405–06. A state-court decision involves an "unreasonable application" of clearly established federal law if it (1) correctly identifies the governing legal rule but unreasonably applies it to the facts of the instant case; or (2) either unreasonably extends an established legal principle to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Id.* at 407. We analyze the state court's adjudication of mixed questions of law and fact under the "unreasonable application" prong of AEDPA. *Jackson v. Bradshaw*, 681 F.3d 753, 760 (6th Cir. 2012).

The Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410. Subsequent Supreme Court decisions have interpreted this directive to mean that an unreasonable application "must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)). AEDPA "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Nevertheless, the state court's error must be "well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

## III.

Smith raises three claims on appeal. First, he contends that the state court acted contrary to or unreasonably applied clearly established federal law by denying him an evidentiary hearing to determine whether the jury improperly relied on certain prejudicial information in rendering its verdict. Second, he contends that the state court unreasonably applied clearly established federal law in concluding that there was sufficient evidence to convict him of felony murder and assault. Third, he contends that the state and district courts erred in refusing to consider the affidavit of Robert Evans. We address each claim in turn.

## A.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to a trial "by an impartial jury." U.S. Const. amend. VI. This guarantee requires a jury

to arrive at its verdict "based upon the evidence developed at the trial." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)).

Under the Supreme Court's decision in *Remmer v. United States*, it is clearly established that "a trial court, faced with an indication of jury bias, must conduct 'a hearing with all interested parties permitted to participate.'" *United States v. Owens*, 426 F.3d 800, 805 (6th Cir. 2005) (quoting *Remmer v. United States*, 347 U.S. 227, 230 (1954)); *see also Smith v. Phillips*, 455 U.S. 209, 215 (1982) ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."). Although a defendant "must do more than simply raise the possibility of bias" to be entitled to a *Remmer* hearing, "a 'colorable claim of extraneous influence'" is sufficient. *Owens*, 426 F.3d at 805 (quoting *United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999)). Once the defendant raises a colorable claim of extraneous influence, the trial court "must hold a *Remmer* hearing 'to afford the defendant an opportunity to establish actual bias.'" *United States v. Lanier*, 870 F.3d 546, 549 (6th Cir. 2017) (quoting *Davis*, 177 F.3d at 557).

The requirements of *Remmer* exist alongside the no-impeachment rule embodied in Federal Rule of Evidence 606(b), which limits the extent to which juror testimony may be used as evidence to impeach a jury verdict. Rule 606(b) provides that "[d]uring an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1). The rule contains several important exceptions, including when a juror's testimony relates to whether "extraneous prejudicial information was improperly brought to the jury's attention" or whether "an outside influence was improperly brought to bear on any juror." *Id.* 606(b)(2)(A)–(B). Subject to the express exceptions in section (b)(2), however, Rule 606(b) "prohibit[s] the use of *any* evidence of juror deliberations" to impeach a jury verdict. *Warger v. Shauers*, 574 U.S. 40, 48 (2014). Michigan has a similar no-impeachment rule. *See* Mich. R. Evid. 606(b); *see also People v. Budzyn*, 566 N.W.2d 229, 236 (Mich. 1997) ("[O]ral testimony

or affidavits may only be received on extraneous or outside errors, such as undue influence by outside parties.").[1]

The no-impeachment rule is grounded in "[s]ubstantial policy considerations," such as encouraging "full and frank discussion in the jury room," ensuring the finality of verdicts, and, overall, preserving the integrity of the jury system. *See Tanner v. United States*, 483 U.S. 107, 119–21 (1987). Accordingly, the Supreme Court has noted that the no-impeachment rule "harmonize[s] with," rather than detracts from, the holding of *Remmer*, which also is based on the principle that "the integrity of jury proceedings must not be jeopardized by unauthorized invasions." *Id.* at 120 (quoting *Remmer*, 347 U.S. at 229).

We similarly have observed that the no-impeachment rule, including its exceptions, seeks "to balance the preservation of the integrity of the jury system and the rights of the defendant." *United States v. Logan*, 250 F.3d 350, 380 (6th Cir. 2001), *superseded on other grounds by statute as recognized in McAuliffe v. United States*, 514 F. App'x 542, 549 (6th Cir. 2013). This balance means that "if [a] case involves an extraneous or external influence on the jury, then a post-verdict interrogation of jurors is permitted in order to adequately protect the defendant's constitutional rights." *Id.* But if the case instead involves an "internal influence," the constitution does not require post-verdict interrogation of jurors. *Id.*; *see also Garcia v. Andrews*, 488 F.3d 370, 375 (6th Cir. 2007) ("[A]n evidentiary hearing delving into allegations of juror misconduct is required only where 'extrinsic influence or relationships have tainted the deliberations.'" (quoting *Tanner*, 483 U.S. at 120)).[2]

---

[1]Michigan Rule of Evidence 606 was amended in 2012 to make it consistent with Federal Rule of Evidence 606. Mich. R. Evid. 606, Staff Comment to 2012 Amendment. At the time the Michigan Court of Appeals considered the merits of Smith's case in 2009, there was no Michigan counterpart to Federal Rule of Evidence 606(b). *Smith*, 2009 WL 3837414, at *2 n.1. Rather, Michigan's no-impeachment rule at the time was judicially created. *See Budzyn*, 566 N.W.2d at 236; *Hoffman v. Monroe Pub. Sch.*, 292 N.W.2d 542, 545 (Mich. Ct. App. 1980).

[2]The Supreme Court has recognized one circumstance in which application of the no-impeachment rule would violate a defendant's Sixth Amendment rights: "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant." *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 869 (2017). In carving out this "constitutional exception for evidence of racial bias," *id.* at 865, the Supreme Court concluded that such bias is "a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice," *id.* at 868. The Supreme Court moreover concluded that other safeguards in the

The distinction between external and internal influences is therefore critical.  In *Tanner*, the Supreme Court decided that allegations of jurors being intoxicated during the trial related to an internal influence.  *Tanner*, 483 U.S. at 116–26.  Focusing on "the nature of the allegation" rather than the physical location of the jurors at the time the alleged misconduct occurred, *id.* at 117, the *Tanner* Court distinguished cases where a bribe was offered to a juror, *id.* (citing *Remmer*, 347 U.S. at 228–30); where a court bailiff made comments about the defendant in the presence of the jury, *id.* (citing *Parker v. Gladden*, 385 U.S. 363, 365 (1966) (per curiam)); where a juror submitted an employment application to the prosecutor's office during the trial, *id.* (citing *Phillips*, 455 U.S. at 209); and where jurors brought newspaper articles about the case into the jury room, *id.* at 118 (citing *United States v. Thomas*, 463 F.2d 1061 (7th Cir. 1972)). Instead, the Court likened the circumstances in *Tanner* to a claim that a juror had a psychological disorder, *id.* at 118–19 (discussing *United States v. Dioguardi*, 492 F.2d 70 (2d Cir. 1974)); or a claim that a juror did not understand English, *id.* at 119 (citing *United States v. Pellegrini*, 441 F. Supp. 1367 (E.D. Pa. 1977), *aff'd without opinion*, 586 F.2d 836 (3d Cir. 1978) (table)).  More recently, the Supreme Court unanimously decided that alleged bias based on a juror's own personal experiences also constituted an internal influence.  *Warger*, 574 U.S. at 51–52. "'External' matters include publicity and information related specifically to the case the jurors are meant to decide," the Court explained, "while 'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room."  *Id.* at 51.

Likewise, we have explained that an external influence "must either relate to the case that the jurors are deciding or be physically brought to the jury room or disseminated to the jury." *Thompson v. Parker*, 867 F.3d 641, 648 (6th Cir. 2017).  Considerations based on jurors' "general knowledge" or "their own wisdom, experience, and common sense" do not constitute external influences.  *Id.* at 647–48 (internal quotation marks and citation omitted).  Thus, we found an external influence where jurors looked up the defendant's Facebook profile and performed a Google search for information relating to issues in the case.  *Ewing v. Horton*, 914 F.3d 1027, 1029–30 (6th Cir. 2019).  But we found no external influence where a jury

trial process—for instance, voir dire—"may prove insufficient" at revealing racial bias.  *Id.* at 868–69.  Smith does not contend that *Peña-Rodriguez* applies here.

decided to sentence a defendant to death after discussing a news account of a different defendant who had committed murder after being paroled. *Thompson*, 867 F.3d at 646–49.

Here, Smith claims that there was an improper external influence on the jury because jurors allegedly changed their votes from "not guilty" to "guilty" based on the belief that Smith would receive a relatively light sentence for felony murder. The state trial court, after hearing arguments by counsel on both sides, denied Smith's request for a *Remmer* hearing. The Michigan Court of Appeals affirmed the trial court's ruling, reasoning that Smith had made "no allegation that a party outside the jury panel approached a member of the jury and provided information on a possible sentence" and that, moreover, "the possible penalty for conviction has no bearing on whether the evidence presented at trial could establish each of the necessary elements of the charged crimes." *Smith*, 2009 WL 3837414, at *2. The Michigan Supreme Court denied discretionary review in a summary order. 779 N.W.2d at 813. We therefore review the decision of the Michigan Court of Appeals, as it is the last explained state-court decision. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *see also Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (en banc) ("We must . . . look to the last reasoned state court opinion to determine the basis for the state court's rejection of [the petitioner's] claim."). And because the Michigan Court of Appeals adjudicated Smith's claim on the merits, we apply AEDPA's required deference. *See* 28 U.S.C. § 2254(d).

Smith first argues that the Michigan Court of Appeals applied the wrong legal standard, and thus, its decision is "contrary to" clearly established federal law. In particular, Smith argues that the state court focused on whether he was entitled to a new trial, rather than on whether he was entitled to a *Remmer* hearing at which he would have the opportunity to show he was entitled to a new trial. It is true that the standard for obtaining a new trial is distinct from the standard for obtaining a *Remmer* hearing: a defendant must show actual prejudice to be entitled to a new trial, whereas the defendant only has to establish some likelihood of prejudice to be entitled to a *Remmer* hearing. *Phillips*, 455 U.S. at 217–18, 221; *see also, e.g.*, *Ewing*, 914 F.3d at 1030–31; *United States v. Harris*, 881 F.3d 945, 953–54 (6th Cir. 2018); *Davis*, 177 F.3d at 557. Thus, if the Michigan Court of Appeals had held that Smith was not entitled to a *Remmer*

hearing simply because he had failed to establish actual prejudice, such a decision would have been contrary to clearly established federal law.

The crux of the Michigan Court of Appeals's decision, however, is not that Smith failed to establish actual prejudice but rather that he failed to allege that the jury's information on possible punishment came from a source outside of the jury room. *See Smith*, 2009 WL 3837414, at *2. In holding that the information on possible punishment needed to have involved an outside source, the Michigan Court of Appeals rejected the view that consideration of possible punishment by the jury is necessarily extraneous. *See id.*

Smith argues that the Michigan Court of Appeals "misconstrued," and thus unreasonably applied, federal law in concluding that the jury's consideration of punishment was not necessarily extraneous. He does not contend that there is a Supreme Court decision establishing that a jury's consideration of possible punishment is in itself extraneous or otherwise unconstitutional, but rather analogizes to decisions from this and other circuits applying *Remmer*, *Tanner*, and their progeny. These decisions are all distinguishable.

First, Smith points to *United States v. Martinez*, 14 F.3d 543, 550–52 (11th Cir. 1994), where the Eleventh Circuit, on direct appeal, reversed the defendant's convictions and remanded for a new trial partly because the jury had considered information about the defendant's possible sentence. But in *Martinez*, there was clear indication that the information on sentencing came from an outside source: a newspaper article that one of the jurors had seen and then discussed in the jury room. *Id.* at 547. There is no similar indication in this case. Additionally, the jury in *Martinez* had used a dictionary to define terms that arose during deliberations, watched news accounts of the trial on television, and regularly brought newspapers reporting trial events into the jury room. *Id.* at 550. There is no allegation that anything of that sort happened here.

Second, Smith points to *United States v. Herndon*, 156 F.3d 629 (6th Cir. 1998). In *Herndon*, also a case on direct appeal, we remanded for a *Remmer* hearing because one of the jurors allegedly had prior business dealings with the defendant. *Id.* at 636–38. We held that such a circumstance constituted an external influence because it "derived from specific

knowledge about or a relationship with either the parties or their witnesses." *Id.* at 636. Nothing indicates that any such knowledge or relationship exists here.

Third, Smith directs our attention to *United States v. Harris*, 881 F.3d 945, 952–54 (6th Cir. 2018), another case on direct appeal where we remanded for a *Remmer* hearing. In *Harris*, although some question remained as to whether actual prejudice existed, there was "credible evidence" that the live-in girlfriend of one of the jurors had discovered and viewed the defendant's LinkedIn profile, likely after searching for the defendant on Google. *Id.* at 953–54. Here, in contrast, there is nothing suggesting that the information the jury considered regarding punishment came from a similar external source.

For the same reason, the other cases to which Smith calls our attention are distinguishable. *See Ewing*, 914 F.3d at 1029–30 (jury allegedly discussed the defendant's Facebook profile and used Google to search for information related to the case); *Oliver v. Quarterman*, 541 F.3d 329, 339–40 (5th Cir. 2008) (jury allegedly consulted Bible passages in deciding whether to impose the death sentence); *Doan v. Brigano*, 237 F.3d 722, 735–36 (6th Cir. 2001) (juror allegedly conducted an experiment at home to test claims made during the defendant's testimony), *abrogated on other grounds by Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *United States v. Aguirre*, 108 F.3d 1284, 1288 (10th Cir. 1997) (jury, in deciding whether to convict the defendant of conspiracy to distribute drugs, allegedly used a dictionary to look up the meaning of the words "distribution" and "pontificate"). None of the cases that Smith cites shows that the Michigan Court of Appeals unreasonably applied clearly established federal law.

Instead, we find the Fourth Circuit's decision in *Fullwood v. Lee*, 290 F.3d 663 (4th Cir. 2002), to be instructive. In that case, the defendant argued that the jury was improperly influenced in deciding whether to impose the death penalty because it allegedly became aware of several pieces of information: (1) the defendant had previously been sentenced to death by another jury, but the sentence had been reversed; (2) any decision it made would be appealed; and (3) if it handed down a life sentence, the defendant would be eligible for parole within 10 to 15 years. *Id.* at 682–83. The Fourth Circuit, on habeas review, concluded that the jury's awareness of the defendant's prior death sentence was necessarily an external influence, even

though the source of the information was never identified, because it "was not revealed to the jury during trial" and "not the kind of general information that jurors bring with them into deliberations." *Id.* at 682. In contrast, the Fourth Circuit decided that the jury's awareness of the defendant's ability to appeal and the possibility of parole was not necessarily an external influence because such awareness derived from general information and "preconceived notions about the legal process." *Id.* at 683–84.

In this case, we find it conceivable that the jurors could have reached the mistaken conclusion that felony murder carries a relatively light sentence based simply upon preconceived notions or beliefs about the legal system. In other words, the jurors' information about Smith's possible sentence reasonably falls within the realm of "general information that jurors bring with them into deliberations." *See id.* at 682. Accordingly, it was not unreasonable for the Michigan Court of Appeals to conclude that the jury's consideration of punishment was not necessarily extraneous and that, absent a colorable allegation that the information came from some outside source, Smith was not entitled to a *Remmer* hearing.

Smith, though, makes one final argument. He suggests that he did, in fact, raise a colorable claim that the specific information the jury considered regarding punishment came from an outside source. He focuses on one particular statement that his trial counsel made to the trial judge at the argument on whether to grant an evidentiary hearing:

> The case law is if it was internal consideration, we wouldn't even be here. It has to be something that is external to the jury, and their deliberations. It's not that they talked about something inside, [it's] that they had something from outside that was introduced.

(R. 12-6, PageID 612.) Based on this statement, Smith contends that his trial counsel raised a colorable claim that the information regarding possible punishment came from an outside source. But trial counsel's statements at other points in the argument suggest otherwise. Indeed, at the beginning of the argument, trial counsel plainly stated, "We would submit the extrinsic influence here was penalty that was discussed improperly by the jury." (*Id.*, PageID 609.) Thus, examining trial counsel's argument as a whole, we find that it was not unreasonable for the Michigan Court of Appeals to conclude that Smith failed to allege an outside source and,

therefore, failed to make a colorable claim of extraneous influence.  We affirm the district court's denial of habeas relief with respect to Smith's claim of jury bias.

**B.**

Smith's next claim for relief is that his convictions for felony murder and assault rest on insufficient evidence.  Specifically, he argues that there was insufficient evidence both to identify him as the perpetrator and to establish intent to commit a felony—in this case, larceny.  The warden, as an initial matter, asserts that Smith did not exhaust part of this claim because he did not present to the state courts the specific argument that there was insufficient evidence of his intent to commit a larceny.  Our disposition of Smith's claim, however, does not require us to decide this exhaustion issue.  Therefore, we proceed directly to the merits.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

It is well established that the Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he [or she] is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  In evaluating a claim that a defendant has been convicted based on insufficient evidence, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16.  "[W]e do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

Additionally, where, as here, the state court adjudicated the claim on the merits, there is a second layer of deference mandated by AEDPA.  That is, even if we were to conclude that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt, we "must

still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Id.* (emphasis omitted).

The Michigan Court of Appeals determined that, viewing the evidence in the light most favorable to the prosecution, "a rational trier of fact could find that the essential elements of the crime were proven beyond reasonable doubt" in Smith's case. *Smith*, 2009 WL 3837414, at \*4. The court reasoned that, as a general matter, "circumstantial evidence and the reasonable inferences it engenders are sufficient to support a conviction, provided the prosecution meets its burden of proof." *Id.* It concluded that the circumstantial evidence in this case—namely, the testimony from Dennis and Evans—was sufficient to support Smith's convictions, and it declined to "second-guess" the jury's determination that Dennis and Evans were credible. *Id.*

Smith argues that the testimony from Dennis and Evans, even viewed in the light most favorable to the prosecution, could not engender a reasonable inference that Smith killed Ralston with the intent to commit a larceny. Smith gives several reasons: Ralston had no safe in her house and did not live at a drug safe house; she had no money; and nothing of value, including Ralston's jewelry box, was taken from the house.

These arguments, however, are reasons to reweigh the testimony of Dennis and Evans, not to conclude that such evidence is insufficient. According to Dennis and Evans, Smith confessed to killing a woman in her fifties while attempting to rob her house, and Ralston's son and housemate both confirmed that Smith was at the house on the evening before Ralston's body was discovered. Smith now provides reasons that the jury could have disbelieved or discounted Dennis's and Evans's testimony as inconsistent with other evidence in the record. But a court evaluating a claim of insufficient evidence is not at liberty to reweigh the evidence or reassess the credibility of witnesses. *Brown*, 567 F.3d at 205; *see also Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002) ("[A]ttacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence." (quoting *United States v. Adamo*, 742 F.2d 927, 935 (6th Cir. 1984))). Given that the Michigan Court of Appeals had to resolve all conflicts in favor of the prosecution and accept the jury's determination that Dennis and Evans were credible, it was not unreasonable for that court to conclude that a rational juror

could have convicted Smith. Therefore, we affirm the district court's denial of habeas relief with respect to Smith's claim of insufficient evidence.

## C.

Last, Smith claims that the state and district courts erred in refusing to consider the affidavit of Robert Evans.

## 1.

We start by clarifying what it is that Smith is claiming. Smith refers to his claim as one of "actual innocence" and cites to the Supreme Court's decision in *Schlup v. Delo*, 513 U.S. 298 (1995). But the claim recognized in *Schlup* "is procedural, rather than substantive," meaning that it "does not by itself provide a basis for relief." *Id.* at 314–15. Rather, a *Schlup* claim provides a "gateway" for the habeas petitioner "to have his [or her] otherwise barred constitutional claim considered on the merits." *Id.* at 315 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)). Smith does not identify any substantive federal constitutional claim underlying his alleged "actual innocence" claim. Thus, his claim is not a "gateway" actual innocence claim under *Schlup*.

Smith's claim also cannot be reviewed as a supplemental sufficiency-of-the-evidence claim. Smith tried to raise such a claim in his amended petition before the district court, asserting that "based on newly discovered evidence, there was insufficient evidence to sustain [his] convictions for felony-murder and assault with intent to rob while armed beyond a reasonable doubt." (R. 38, PageID 906.) Smith argued that this claim of newly discovered evidence "should be addressed together" with his separate sufficiency-of-the-evidence claim— essentially arguing that the affidavit makes the already shaky evidence upon which he was convicted even shakier. (*Id.*, PageID 907.) But a reviewing court evaluating a sufficiency-of-the-evidence claim cannot consider newly discovered evidence. Rather, the court must consider "the trial testimony and exhibits in the light most favorable to the prosecution," and may not reassess the weight of the evidence or the credibility of witnesses. *Brown*, 567 F.3d at 205; *see also Jackson*, 443 U.S. 318–19; *cf. Schlup*, 513 U.S. at 330 (distinguishing between a claim of insufficient evidence under *Jackson*, which prohibits assessments of witness credibility, and a

gateway actual innocence claim under *Schlup*, which allows such assessments based on newly presented evidence). Because Smith's claim of newly discovered evidence requires the reviewing court to reweigh evidence and make a probabilistic determination of what a reasonable trier of fact likely would do, it cannot be assessed as a supplemental sufficiency-of-the-evidence claim.

We accordingly agree with the district court that Smith's claim based on the affidavit of Robert Evans is a freestanding actual innocence claim. The Supreme Court has defined a freestanding actual innocence claim as one that "argues that [the petitioner] is entitled to habeas relief because newly discovered evidence shows that [the petitioner's] conviction is factually incorrect." *Herrera*, 506 U.S. at 404. Smith's claim based on the affidavit is exactly that.

**2.**

Next, we turn to the warden's arguments that Smith's claim is untimely and procedurally defaulted. The warden argues that because Smith's claim based on the affidavit was not raised in federal court until Smith amended his petition in December 2017, and because the claim was not otherwise tolled, it is barred under the one-year statute of limitations. *See* 28 U.S.C. § 2244(d)(1). The warden also argues that because the state court relied on state procedural grounds to deny Smith's claim for a new trial based on the affidavit, Smith's claim here is procedurally barred. The district court acknowledged the warden's procedural arguments but decided to deny Smith's claim on the merits.

Although issues of timeliness and procedural default in habeas proceedings ordinarily should be addressed first, those issues do not affect our jurisdiction. *Day v. McDonough*, 547 U.S. 198, 205 (2006); *Trest v. Cain*, 522 U.S. 87, 89 (1997). Therefore, we may sometimes reach the merits of a petitioner's claim, particularly when the merits are easily resolvable against the petitioner while the procedural issues are complicated. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *see also, e.g.*, *Bales v. Bell*, 788 F.3d 568, 573 (6th Cir. 2015); *Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003). Here, resolution of the procedural issues is not necessary to our disposition of Smith's

freestanding actual innocence claim, and we agree with the district court that the claim is better resolved on the merits.  We turn there now.

**3.**

The Supreme Court has not answered whether freestanding actual innocence claims are cognizable on habeas review.  *See House v. Bell*, 547 U.S. 518, 555 (2006) (expressly declining to resolve the issue).  Our circuit, however, has "repeatedly indicated that such claims are not cognizable on habeas."  *Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007) (listing cases).  Smith nevertheless invites us to resolve this question in his favor.

Even if we were to recognize a freestanding actual innocence claim, Smith's claim based on the affidavit would not succeed.  The Supreme Court has noted that if freestanding actual innocence claims were cognizable, the petitioner's burden "would necessarily be extraordinarily high."  *Herrera*, 506 U.S. at 417.  This is because such a claim, unattached to any other claim of constitutional error, presupposes that the petitioner "was tried before a jury of his [or her] peers, with the full panoply of protections that our Constitution affords criminal defendants."  *Id.* at 419 (O'Connor, J., concurring).  Accordingly, the Ninth Circuit has established that a petitioner asserting a freestanding actual innocence claim "must go beyond demonstrating doubt about his [or her] guilt" and "must affirmatively prove that he [or she] is probably innocent."  *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc).

Without the ability to make credibility determinations, we conclude that Smith does not prove that he is probably innocent.  To be sure, the affidavit of Robert Evans seriously undermines the reliability of Dennis's and Evans's testimony, but it falls short of affirmatively proving that Smith is innocent.  The affidavit does not provide Smith with an alibi, show that someone else killed Ralston, or otherwise "preclude any possibility of [Smith's] guilt."  *See id.* at 477.  Instead, it simply gives us further reason to doubt Dennis's and Evans's testimony.  Thus, Smith's claim based on the affidavit of Robert Evans is not a basis on which we can grant him habeas relief.

**IV.**

For the reasons above, we affirm the district court's denial of Smith's petition for a writ of habeas corpus.