RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0018p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
─────────────────

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee*,

*v.*

JASON DALE KECHEGO,

        *Defendant-Appellant*.

No. 22-2041

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:19-cr-20498-2—Paul D. Borman, District Judge.

Argued: December 6, 2023

Decided and Filed: January 31, 2024

Before: COLE, GILMAN, and LARSEN, Circuit Judges.
─────────────────

## COUNSEL

**ARGUED:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. William J. Vailliencourt, Jr., UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. William J. Vailliencourt, Jr., UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.
─────────────────

## OPINION
─────────────────

LARSEN, Circuit Judge. Jason Kechego was convicted of second-degree murder for killing fellow inmate Christian Maire. Kechego challenges several of the district court's rulings during trial. We AFFIRM.

I.

Jason Kechego was an inmate at the Federal Detention Center in Milan, Michigan. On December 17, 2018, Kechego received a phone call informing him that his niece had been molested. Around the same time, a newspaper article was circulating among the inmates revealing that Christian Maire, a fellow inmate, had been convicted of child exploitation. Inmates who had committed such crimes were referred to as "chomos" and were at the bottom of the prison's social hierarchy.

Roughly two weeks later, on January 2, 2019, Kechego gathered with fellow inmates Alex Castro, Adam Wright, and Joseph Raphael to consume contraband alcohol. The gathering devolved into an argument, and Raphael was badly beaten. Kechego, Castro, and Wright then went to Maire's cell. They beat and stabbed Maire and threw him down a flight of stairs. Maire died. In the aftermath, Kechego remarked to the guards that "they got themselves a chomo" and that the guards should be "giving them high-fives." R. 262, Jury Trial Tr., July 11, 2022, PageID 2906. Kechego's blood-alcohol content the morning after Maire's killing was 0.236.

A grand jury indicted Kechego, Castro, and Wright for various offenses. A superseding indictment charged Kechego with first-degree murder, 18 U.S.C. § 1111(a), conspiracy to commit first-degree murder, 18 U.S.C. § 1117, assault with the intent to commit murder, 18 U.S.C. § 113(a)(1), and assault resulting in serious bodily injury, 18 U.S.C. § 113(a)(6). Wright pleaded guilty; Kechego and Castro went to trial.

On June 6, 2022, a month before trial, Kechego notified the government that he was planning to present expert testimony about retrograde extrapolation—a technique for estimating prior blood-alcohol content based on a later measurement. The government moved to exclude the testimony because Kechego had not provided an expert report. *See* Fed. R. Crim. P. 16(b)(1)(C). The court ordered Kechego to provide the report by June 27, 2022. Kechego failed to meet the deadline, so on June 30, 2022, the government again moved to exclude. At a hearing on the motion, Kechego said that he was not sure that he would ever be able to provide an expert report. The district court then excluded the testimony. At trial, Kechego was permitted to introduce evidence of his blood-alcohol content the morning after Maire's killing and expert testimony about prison culture.

The trial began on July 6, 2022.  In his opening statement, Kechego told the jury that it would hear about the December 17, 2018, phone call that had informed him of his niece's sexual assault.  Kechego later sought to admit evidence of the call, but the government objected, arguing that the call was irrelevant because it took place two weeks before Maire's killing.  The district court agreed with the government and excluded the call.

At the close of evidence, Kechego requested a voluntary-manslaughter instruction.  He argued that he lacked malice because he acted out of a "heat of passion," specifically, "a deep-seated hatred for chomos that boiled over."  R. 354, Jury Trial Tr., July 14, 2022, PageID 4344.  Kechego characterized the phone call, the newspaper article, his intoxication, and the prison culture as a "perfect storm" that caused him to lose control.  *Id.* at 4347–48.  The government objected, arguing that there was no evidence of a sudden and adequate provocation.  The district court agreed and refused to give the instruction.

On July 18, 2022, the district court instructed the jury on the charges in the superseding indictment and the lesser-included offense of second-degree murder.  The jury deliberated for the next five days.  On July 22, 2022, the foreperson sent a note to the judge saying that she no longer felt comfortable and would like to be replaced.  The foreperson complained that the other jurors were playing cards, screaming, arguing, and not taking her seriously.  The foreperson speculated that the other jurors were treating her differently because she had revealed during voir dire that her brother had been incarcerated.  The judge called the foreperson into the courtroom and told her that he would order the other jurors to change their behavior.  But the foreperson maintained that she could not return to deliberations.  She also said that when the other jurors disagreed with her, they "pull[ed] out phones" and made noises.  R. 359, Jury Trial Tr., July 22, 2022, PageID 4555.  The judge again asked the foreperson whether she would return to deliberations if he warned the other jurors that they risked contempt charges for failing to be respectful.  The foreperson refused and was dismissed from the courtroom.

The district court consulted the parties as to the appropriate remedy.  Kechego argued for a mistrial.  The government suggested that the jury be admonished and ordered to continue deliberating.  The court accepted neither proposal.  The government then suggested taking a partial verdict.  The court was receptive to that and asked Kechego what he thought.  Kechego

voiced concern that the entire process was so tainted that no verdict should be taken.  The court disagreed and told the parties that it planned to ask the foreperson whether any partial verdicts had been reached "unanimously" and "voluntarily."  *Id.* at 4567.  The court inquired whether this plan was "[o]kay?"  *Id.* at 4568.  Kechego then agreed to "[l]eave it to the Court's discretion."  *Id.*

The foreperson was called back into the courtroom.  The judge asked "whether the jury has reached unanimity, which would include [the foreperson] at a time that [she] fe[lt] comfortable, with regard to any of the counts in the indictment."  *Id.*  The foreperson reported unanimity on all but three counts and was again dismissed from the courtroom.

The government worried that the district court could not elicit a partial verdict without an indication from the jury that it had reached one, and without then sending the jury back to continue deliberations.  The district court responded that it was not going to return the foreperson to deliberations but acknowledged that this was an unusual case.  After considering the issue, the district court concluded that it could accept a partial verdict.  The court explained that it planned to have the foreperson complete the verdict form before polling the jurors.  Kechego began to say: "Just for the record, I agree with the Court's pro . . . ."  *Id.* at 4572.  But the district court interrupted.

The district court had the foreperson complete the verdict form and called the other jurors in.  The court read each count of the verdict form to the jury and polled each juror individually.  The jury unanimously convicted Kechego of second-degree murder; unanimously acquitted him of first-degree murder, assault with intent to commit murder, and assault resulting in serious bodily injury; and failed to reach unanimity on conspiracy to commit first-degree murder.  The court accepted the partial verdict, declared a mistrial on the remaining counts, and dismissed the jury.  The government later dismissed the conspiracy charge.

Kechego was sentenced to 336 months' imprisonment.  He now appeals.

II.

Kechego objects to several of the district court's rulings during trial.  He argues that the district court: (1) should have held a *Remmer* hearing; (2) should not have accepted a partial verdict; (3) should have given a voluntary-manslaughter instruction; (4) should have permitted his expert to testify; and (5) should have admitted evidence of a phone call that he received.  We conclude that the district court made no reversible error.

A.

First, Kechego argues that, because some jurors pulled out phones during deliberations, the district court should have held a *Remmer* hearing—a hearing to examine whether the verdict was tainted by external influences.  *See Remmer v. United States*, 347 U.S. 227 (1954).  But Kechego did not ask for a *Remmer* hearing, so the plain-error standard governs our review. *United States v. Mack*, 729 F.3d 594, 606 (6th Cir. 2013).  That standard requires an error that is "clear or obvious," affects the appellant's substantial rights, and "seriously affects the fairness, integrity or public reputation of judicial proceedings."  *United States v. Soto*, 794 F.3d 635, 655 (6th Cir. 2015) (citation omitted).  An error is clear or obvious only when the law is "settled," *see Henderson v. United States*, 568 U.S. 266, 269 (2013), "rather than subject to reasonable dispute," *see Puckett v. United States*, 556 U.S. 129, 135 (2009).  It is a demanding standard, met only in "exceptional circumstances."  *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (citation omitted).

In *Remmer*, a juror reported that, during trial, an unknown person had told him that he could "profit" from his decision in the case.  347 U.S. at 228.  The Supreme Court ordered a hearing to explore the effect of this external influence "upon the juror, and whether or not it was prejudicial."  *Id.* at 230.  Following *Remmer*, the Court has defined "external" influences to "include publicity and information related specifically to the case the jurors are meant to decide." *Warger v. Shauers*, 574 U.S. 40, 51 (2014).  And we have held that a hearing is required whenever "a colorable claim of extraneous influence has been raised."  *United States v. Herndon*, 156 F.3d 629, 635 (6th Cir. 1998).  But a claim of external influence is not colorable merely because it is possible.  *United States v. Lanier*, 870 F.3d 546, 549 (6th Cir. 2017) ("[A] *Remmer* hearing is not necessary in every instance of possible unauthorized third-party

contact."). The claim must present a "likelihood of having affected the verdict," *United States v. Gonzales*, 227 F.3d 520, 527 (6th Cir. 2000), and "must be supported by credible evidence," *United States v. Bailey*, 2022 WL 2444930, at *8 (6th Cir. July 5, 2022).

We have found colorable claims of external influence when some specific evidence connects a juror to outside information particular to the case at hand or to an effort to collect such information. "Thus, we found an external influence where jurors looked up the defendant's Facebook profile and performed a Google search for information relating to issues in the case." *Smith v. Nagy*, 962 F.3d 192, 201 (6th Cir. 2020) (citing *Ewing v. Horton*, 914 F.3d 1027, 1029–30 (6th Cir. 2019)). We also found an external influence when jurors were told that "members of the community" had become "aware of" one juror's service, which caused him to fear "retaliation from the defendants, their families, and their acquaintances." *See United States v. Davis*, 177 F.3d 552, 556–57 (6th Cir. 1999). Similarly, we found an external influence when a juror sought "outside input on the case" from an assistant district attorney, not involved with the matter, although it was unclear whether any such input was received. *See United States v. Lanier*, 870 F.3d 546, 550 (6th Cir. 2017).

"But we found no external influence where a jury decided to sentence a defendant to death after discussing a news account of a different defendant who had committed murder after being paroled." *Nagy*, 962 F.3d at 201 (citing *Thompson v. Parker*, 867 F.3d 461, 646–49 (6th Cir. 2017)). Nor did we find a colorable claim of external influence when factual statements some jurors made during deliberations suggested that they "may have read" a news article about the gang involved in the case. *Bailey*, 2022 WL 2444930, at *10. There was no allegation that the article was in the jury room or that any of the jurors had even mentioned the article. *Id.* So the claim of external influence was "mere speculation." *Id.*

This caselaw does not make it "clear or obvious" that Kechego was entitled to a *Remmer* hearing. The foreperson reported only that some jurors "pull[ed] out phones" during deliberations. R. 359, Jury Trial Tr., July 22, 2022, PageID 4555. That may well have been a violation of the court rules. *See* E.D. Mich. Local Rule 83.32(b)(2)(F) ("Jurors . . . may carry a Personal Electronic Device, but may not use the device in any way except upon permission of a judicial officer."). But a violation of court rules is not enough to trigger a *Remmer* hearing; that

requires a "colorable claim" that the jurors were exposed to external influences likely to taint the verdict. *See Gonzales*, 227 F.3d at 527. Here, the foreperson did not say that the phones were being used for anything specific. Kechego only speculates that jurors may have been "look[ing] up information about the case" or "legal terms with which they were struggling." Appellant Br. at 14. Kechego concedes that, "[o]n this record, there is no way of knowing" what the jurors were doing on their phones. *Id.* He argues that this is because the district court should have inquired further into the jurors' cell-phone usage and failed to do so. But without some specific evidence connecting a juror to outside information particular to the case at hand or to an effort to collect such information, Kechego's claim of external influence is too speculative to require a *Remmer* hearing.

Kechego also notes that some jurors were in different rooms playing cards and that the environment was hostile. But internal influences such as these are not the proper subject of a *Remmer* hearing. *See Herndon*, 156 F.3d at 634.

The district court did not plainly err by not holding a *Remmer* hearing.

B.

Second, Kechego argues that the district court should not have accepted a partial verdict. Kechego initially responded to the breakdown of deliberations by asking for a mistrial. When the district court proposed inquiring into a partial verdict, Kechego voiced concern that the process was tainted. But he then said that he would "[l]eave it to the Court's discretion." R. 359, Jury Trial Tr., July 22, 2022, PageID 4568. That could be seen as a waiver. At a minimum, that statement withdrew Kechego's previous objection, and he voiced no further objection. So we review the district court's acceptance of the partial verdict under the plain-error standard. *See United States v. Beck*, 842 F. App'x 1010, 1014 (6th Cir. 2021).

The Federal Rules of Criminal Procedure permit the jury to return a partial verdict and authorize the district court to declare a mistrial when the jury cannot reach a verdict on one or more counts. Fed. R. Crim. P. 31(b). We have held that, "before declaring a mistrial," the district court "may inquire whether the jury had reached a partial verdict with respect to any of the defendants or any of the charges." *In re Ford*, 987 F.2d 334, 340 (6th Cir. 1992). But we

have not said exactly when or how the district court may elicit or accept such a verdict. In *United States v. Heriot*, 496 F.3d 601 (6th Cir. 2007), we expressed concern that a court might "turn a tentative decision into a final one." *Id.* at 608 (quoting *United States v. Wheeler*, 802 F.2d 778, 781 (5th Cir. 1986)). And we cited with approval an Eighth Circuit case "admonishing district courts 'not to intrude on the jury's deliberative process.'" *Id.* (quoting *United States v. Benedict*, 95 F.3d 17, 19 (8th Cir. 1996)). Beyond that, we have given little concrete guidance. Our sister circuits have said that a district court might err by inquiring into a partial verdict while deliberations are ongoing and where there is no indication that the jury is at an impasse. *See Benedict*, 95 F.3d at 19. But a court does not err if it asks about a partial verdict when it is clear that the jury is at an impasse and further deliberations would prove fruitless. *See Wheeler*, 802 F.2d at 781.

This court's cases do not make it clear or obvious that any error occurred when the district court accepted a partial verdict in the circumstances presented here. The foreperson told the district court that deliberations had broken down and asked to be replaced. The district court decided not to order the foreperson to return to deliberations and proposed asking whether the jury had reached a partial verdict. Kechego initially protested, arguing that any verdict would be tainted. The district court responded that it would ask the foreperson whether the jury had reached any unanimous verdict that included the foreperson's "voluntary, intelligent, thoughtful conclusion." R. 359, Jury Trial Tr., July 22, 2022, PageID 4567. The district court emphasized that it would make sure that any verdict was arrived at "voluntarily without pressure." *Id.* at 4568. The court concluded by asking if that was "[o]kay?" *Id.* In response, Kechego agreed to "[l]eave it to the Court's discretion." *Id.* The district court called the foreperson back into the courtroom and asked her whether the jury had reached any unanimous verdict, "includ[ing] [the foreperson] at a time that [she] fe[lt] comfortable." *Id.* The foreperson reported that the jury had reached unanimity on all but three counts. The district court then asked her to complete a verdict form to that effect. The district court polled each juror as to each count, confirming both the unanimous verdicts and those counts as to which there was no unanimous agreement. And although the prosecutor expressed reservation about whether this process would be acceptable, defense counsel made no objection.

In sum, the district court concluded, as did Kechego, that the deliberative process had broken down and should not continue.  The district court then asked, "neutral[ly]" and without presumption, whether there had been a partial verdict. *See United States v. Moore*, 763 F.3d 900, 911 (7th Cir. 2014).  There is "no indication that the jury itself wished to reconsider the verdicts." *Heriot*, 496 F.3d at 608.  And, as we found significant in *Heriot*, the district court "polled the jury . . . and its members unanimously affirmed the verdicts." *Id.*

Kechego argues that this case is different because the district court inquired into the partial verdict before the jury itself indicated that it had agreed on some counts.  But there is nothing clearly problematic about that.  This court's model instruction for partial verdicts permits the district court to give that instruction when the jurors indicate that they have reached such a verdict *or* when the jury has deliberated for an "extensive period of time."  6th Cir. Pattern Instruction 9.03.  And Kechego has pointed to no authority suggesting that the district court may never broach the question of a partial verdict unless the jury has come forward with a statement that it is deadlocked or that it has reached a partial verdict.  Rather, the available authority suggests that when it is clear from the circumstances, even the passage of time, that deliberations are not progressing, the district court may inquire about a partial verdict.  In this case, the district court had good reason to believe that deliberations had broken down—the foreperson said so.  As a result, it is not clear or obvious that this is a case in which the district court's inquiry "turn[ed] a tentative decision into a final one." *See Heriot*, 496 F.3d at 608 (citation omitted).

Kechego also argues that this case is controlled by *Ross v. Yost*, 2020 WL 6440470 (6th Cir. 2020).  *Ross* is an unpublished single-judge order denying an application for a certificate of appealability, so it is not binding. *See Scarber v. Palmer*, 808 F.3d 1093, 1096 (6th Cir. 2015).  Regardless, *Ross* does not help Kechego.  In the state-court proceedings against Ross, the court "declared a mistrial in the midst of deliberations." *State v. Ross*, 15 N.E.3d 1213, 1218 (Ohio Ct. App. 2014).  It turned out that the jury had already completed three verdict forms acquitting the defendant, which were left behind in the jury room. *Id.*  Ross sought to rely on those verdict forms to bar retrial under the Double Jeopardy Clause. *Id.*  The state court denied the claim in part because the verdicts were "tentative," but "more importantly" because they were "tainted." *Id.* at 1224.  There was a colorable claim of external influence because one juror claimed that another potential suspect had passed a polygraph examination—information that could only have

come from an outside source.  *Id.*  In this case, there is no colorable claim of external influence, and no work-in-progress verdict forms.  Instead, the jury returned its verdict in the courtroom, as required.  *See* Fed. R. Crim. P. 31(a).  The district court read the verdict and polled each juror individually to confirm that it was the jury's unanimous finding.

The district court did not plainly err in accepting a partial verdict in these circumstances.

C.

Third, Kechego argues that the district court should have given a voluntary-manslaughter instruction.  We review the district court's refusal to give an instruction under the abuse-of-discretion standard.  *United States v. Hills*, 27 F.4th 1155, 1188 (6th Cir. 2022).

A defendant is entitled to an instruction on a lesser-included offense when:  "(1) a proper request is made; (2) the elements of the lesser offense are identical to part of the elements of the greater offense; (3) the evidence would support a conviction on the lesser offense; and (4) the proof on the element or elements differentiating the two crimes is sufficiently disputed so that a jury could consistently acquit on the greater offense and convict on the lesser."  *United States v. Colon*, 268 F.3d 367, 373 (6th Cir. 2001).  The third requirement is at issue here.  A defendant is "entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable juror to find in his favor."  *United States v. Tisdale*, 980 F.3d 1089, 1095 (6th Cir. 2020) (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988)).

18 U.S.C. § 1112 defines voluntary manslaughter as the "unlawful killing of a person, without malice" "upon a sudden quarrel or heat of passion."  "[T]o constitute manslaughter, there must be sufficient evidence of provocation to arouse an ordinary and reasonable person to kill the decedent."  *United States v. Bishop*, 1998 WL 385898, at *6 (6th Cir. 1998).  "It is well established that if the defendant had enough time between the provocation and the killing to reflect on his or her intended course of action, 'then the mere fact of passion would not reduce the crime below murder.'"  *United States v. Bordeaux*, 980 F.2d 534, 537–38 (8th Cir. 1992) (quoting *Collins v. United States*, 150 U.S. 62, 65 (1893)); *see also* Wayne R. LaFave, 2 Subst. Crim. L. § 15.2 (3d ed.) (emphasizing the "temporary" loss of self-control).  The heat of passion must result from a "*sudden* provocation."  *See Bordeaux*, 980 F.3d at 537.

In this case, there was insufficient evidence to support a voluntary-manslaughter conviction.  Kechego argued that he lacked malice because he acted out of a "heat of passion," specifically, "a deep-seated hatred for chomos that boiled over."  R. 354, Jury Trial Tr., July 14, 2022, PageID 4344.  Kechego characterized the phone call, the newspaper article, his intoxication, and prison culture as a "perfect storm" that caused him to lose control.  *Id.* at 4347–48.  But a two-week-old phone call and similarly dated newspaper article are not sudden provocations.  The same goes for a deep-seated hatred of child molesters, which Kechego's expert said was part of a broader prison culture.  And the standard against which Kechego's conduct is measured is that of an ordinary and reasonable sober person, so his intoxication is unavailing.  *See* Wayne R. LaFave, 2 Subst. Crim. L. § 9.5(e) (3d ed.).

Kechego argues that the district court applied too rigorous a standard in deciding not to give the voluntary-manslaughter instruction.  He says that he needed only "some evidence" of heat of passion.  Appellant Br. at 26.  There are two problems with that.  First, it is not clear that he proffered any evidence of heat of passion, as that term is used in the law.  Second, "some evidence" is not the standard.  As Kechego later acknowledges, there must be "sufficient" evidence to support a conviction on the lesser offense.  Reply Br. at 8 (citing *United States v. Eggleston*, 823 F. App'x 340, 346 (6th Cir. 2020) (quoting *Mathews*, 485 U.S. at 63)).

The district court did not abuse its discretion in denying Kechego's request for a voluntary-manslaughter instruction.

### D.

Fourth, Kechego argues that the district court should have permitted his expert to testify on retrograde extrapolation.  The district court excluded this testimony as a discovery sanction. We review the district court's decision under the abuse-of-discretion standard.  *United States v. Maples*, 60 F.3d 244, 246 (6th Cir. 1995).

The Federal Rules of Criminal Procedure require a defendant to provide a written summary of expert testimony when that testimony goes to the defendant's mental condition. Fed. R. Crim. P. 16(b)(1)(C).  The Rules provide that when a party fails to comply, the district court may: (1) order discovery; (2) grant a continuance; (3) exclude the evidence; or (4) enter

any other order that is "just under the circumstances." Fed. R. Crim. P. 16(d)(2). The district court should impose the "'least severe sanction necessary' . . . to serve remedial objectives." *Maples*, 60 F.3d at 247–48. That decision is informed by: (1) the reason for delay; (2) the degree of prejudice; and (3) whether the prejudice can be cured with a less severe sanction. *Id.* at 247.

In this case, Kechego failed to provide an expert report despite being provided an extended deadline to do so. What's more, he informed the district court that he was not confident he would ever be able to provide the report. Kechego does not challenge these facts. Instead, Kechego argues that the district court abused its discretion in excluding his expert, which he characterizes as "choos[ing] the most onerous remedy." Appellant Br. at 29. He says that the government "knew the gist" of his expert's planned testimony and could have prepared without delaying trial. *Id.* at 30. But the district court considered that argument, disagreed, and carefully considered the appropriate sanction. First, the court concluded that there was no adequate justification for Kechego's failure to provide the report. *United States v. Castro*, 2022 WL 2915582, at \*4 (E.D. Mich. July 25, 2022). Second, the court concluded that allowing the expert to testify without the report would significantly prejudice the government by hindering its efforts to prepare for cross-examination or secure a rebuttal witness. *Id.* Third, the court concluded that no less severe sanction would suffice because the jury had already been selected, witnesses had been scheduled, and trial capacity was limited post-COVID-19. *Id.* The district court thoughtfully exercised its discretion.

Kechego nevertheless argues that, "under similar circumstances, the Government has not received such a draconian punishment." Appellant Br. at 30 (citing *United States v. Ledbetter*, 929 F.3d 338 (6th Cir. 2019)). But Kechego fails to account for the fact that the court had already extended the disclosure deadline, provided warning that no further extensions would be given, and concluded that this scientific subject matter could not be adequately rebutted without a report. He offers no case in support of his theory that a district court abuses its discretion in excluding expert testimony under those circumstances. And we see no abuse of discretion here.

E.

Finally, Kechego argues that the district court should have admitted evidence of a phone call that he received two weeks before Maire's killing.  That phone call reported that his niece had been sexually assaulted, although the assault had nothing to do with Maire.  The district court excluded the phone call on the ground that it was irrelevant, *see* Fed. R. Evid. 402, and because, even if relevant, admitting it would have been more unfairly prejudicial than probative, *see* Fed. R. Evid. 403.  We review the district court's ruling under the abuse-of-discretion standard.  *United States v. Chavez*, 951 F.3d 349, 357–58 (6th Cir. 2020).

Kechego argues that the call was relevant evidence of his mental state because it goes to why he killed Maire.  He also notes that the district court did not explain why the evidence was more unfairly prejudicial than probative.[1]  Regardless, we cannot grant relief because the district court's error, if any, was harmless.  *See* Fed. R. Crim. P. 52(a).  To the extent that Kechego argues that the phone call was admissible evidence of his mental state, relevant to the distinction between first- and second-degree murder, any error was harmless because Kechego was acquitted of first-degree murder.  And as to Kechego's voluntary-manslaughter theory, any error was harmless because, even considering the minimally probative two-week-old phone call, Kechego proffered insufficient evidence for an instruction on that theory for the reasons previously discussed.  "[W]e may not grant a new trial on the basis of non-constitutional trial error where we have a 'fair assurance' that the verdict was not 'substantially swayed' by the error."  *United States v. Kettles*, 970 F.3d 637, 643 (6th Cir. 2020) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).  We have that assurance here.

\* \* \*

We AFFIRM.

---

[1]It may be that the district court excluded the evidence because of its tendency to engender sympathy for Kechego.  We have stated that evidence is not unfairly prejudicial merely because it paints the defendant in a bad light.  *See United States v. Young*, 847 F.3d 328, 349 (6th Cir. 2017).  It follows that evidence is not unfairly prejudicial merely because it paints the defendant in a sympathetic light.  We need not decide how that principle applies to this case because any error in excluding the phone call evidence was harmless.